THE MURRAY RIVER. THE MARGARET MORAN. MURRAY LIGHTERAGE & TRANSP. CO. v. B. TURECAMO CONTRACTING CO., Inc., et al.

District Court, E. D. New York.

Dec. 17, 1929.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for libelant.

William F. Purdy, of New York City, for respondent Contracting Co.

Macklin, Brown, Lenahan & Speer, of New York City (R. F. Lenahan, of New York City, of counsel), for respondent Towing & Transp. Co.

Austin J. McMahon, of New York City, for claimant.

INCH, District Judge.

On Sunday, July 4, 1926, libelant's deckscow, Murray River, was injured. Her owners have sued the Turecamo company and the tug Margaret Moran, alleging that the berth to which the tug Moran towed the Murray River and at which the scow was damaged, was unsafe and known to be unsafe. The Turecamo company impleaded the Gahagan company et al., alleging that if the berth was unsafe and the deckscow was so damaged, that it was due entirely to the fault of the impleaded parties. The issue to be decided is one largely of fact.

I find from the testimony that this deckscow Murray River, with a full load of gravel was taken in tow, on July 4, 1926, together with a coal boat, by the tug Margaret Moran. These two boats were towed to the Turecamo dock at South Brooklyn, N. Y. The Murray River was at that time in good condition and not leaking.

When the Moran came to the Turecamo dock, she tied up the coal boat at the end of the dock, and proceeded to place the Murray River alongside of another scow that was lying near the end of the dock.

Flowers, the master of the Murray River, then proceeded to get a line out to this scow when the "watchman came down and told the captain of the Moran and myself that I could not lay there, that I would have to go up higher on the dock."

McBride, the master of the Moran, confirms this. The watchman was not produced.

■ Accordingly, the orders of this watchman were obeyed. The Murray River was placed in the berth indicated by him, and the tug departed.

There is no liability on the part of the tug on the facts of this record.

■ The duty of providing a safe berth was on the Turecamo company, the owner of the wharf, to whom the Murray River was consigned. The Good News (D. C.) 272 F. 482, affirmed (C. C. A.) 281 F. 1020.

It was obliged to take all reasonable steps to keep the berth safe. Ætna Co. v. Davidson Co. (C. C. A.) 257 F. 68. Smith v. Burnett, 173 U. S. 430, 19 S. Ct. 442, 43 L. Ed. 756.

■ This duty was not performed by it, and as a proximate result thereof, the Murray River was seriously injured.

When the tide fell she rested upon an obstruction, to which reference will be made hereafter. As the tide rose, Flowers heard a "cracking noise" and found she had sprung a leak. This was repeated on the second tide, whereupon she filled and sank.

It appears, clearly, from the testimony that for a considerable time prior to this accident to the Murray River, the condition of this berth had been unsafe and not only should have been, but was known to the Turecamo company. In fact Turecamo, on cross-examination, testified: "Q. You knew it wasn't safe while it lay there? A. Yes at that time, at that particular time."

It seems that in November of the previous year, a man named Greenberg had been allowed by Turecamo to load a barge with secondhand iron and bricks at this dock, for which right he had paid Turecamo $100, and in addition had agreed to pay him $5, for each lift, for the use of the apparatus employed in placing the iron beams on the boat.

The Gahagan company owned this boat and possibly was interested in the arrangements.

However this may be, a considerable part of the iron and bricks fell overboard into the berth and remained there until a series of accidents commenced to scows resting at that dock, all indicating an unsafe berth.

Turecamo was aware, long before the accident to the Murray River, that this Greenberg boat had sunk, and that some of these iron beams had gone overboard. A number of these beams were lifted from the bottom onto the dock, and Turecamo notified Gahagan and sent a bill to him.

According to Turecamo, whose testimony is not as clear as might be desired, while this Greenberg boat had sunk in November, 1925, "I discovered it around June 1926."

Another place he testified "it was about May that the first complaint came in."

This apparently refers to a boat of the Tompkins Stone Company which was damaged at the berth.

There is no necessity for going into details as to his testimony, suffice it to say, Turecamo was aware of the danger to a scow at this berth a considerable time prior to the time when he allowed the Murray River to rest at it. The Harris (D. C.) 33 F. 295.

Nor was Flowers careless. He obeyed, as he should, the watchman who was in apparent authority and representing the Turecamo company. Smith v. Gould (D. C.) 136 F. 719. Flowers stayed by his boat, and with the help of the engineer on the Turecamo dock worked the gasoline pump on the dock. The accident occurred July 4, and the following day, July 5, was celebrated as the holiday. He endeavored to get in touch with his employers, but the circumstances were such that he cannot be blamed for not being successful. He also, with said engineer, endeavored to lighten the scow, and did take out several bucketsful of gravel.

While some of the testimony is not in strict accord, sufficient appears to justify a finding that the place where the Murray River was berthed was unsafe, and known to be unsafe by Turecamo.

That she was damaged by such unsafe berth is likewise evident, and the presence at that place of obstructions sufficient to cause such damage is reasonably established.

I see no reason in this case to distinguish between damage caused by the first and second tide.

The petition of the Turecamo company impleaded the Gahagan company, and in substance alleges: That the Greenberg scow was carelessly loaded, and, as a consequence, dumped part of her load; that the Turecamo company notified the Gahagan company to dredge, or otherwise remove all of this dump material from the bottom of the bay, but that the latter carelessly and willfully failed to do this; that accordingly, the Turecamo company "employed all due diligence to clear out and take out all of the dump material and in so doing spent a large amount of time and considerable money"; that any damage received by the Murray River was caused through the negligence of the Gahagan company.

The testimony in regard to any special contract between the Turecamo company and the Gahagan company is most incomplete.

Greenberg testified to a fixed charge which was paid. Turecamo testified that Gahagan had said, prior to Greenberg being allowed to tie up and load the scow, "if anything happens I will make good." This is denied by Gahagan, who states that he had no conversation with Turecamo about placing the Greenberg scow or moving the material.

Certain witnesses testified they had seen Gahagan on the dock.

Certainly, the owner of the wharf cannot obtain freedom from his liability to libellant by showing what the obstruction was, and how it got there, nor is there any proof that the overturning of the Greenberg scow in November, 1925, was the proximate cause of the injury to the Murray River.

The Murray River was damaged directly by reason of the failure on the part of the Turecamo company to maintain a safe berth. It knew of the sinking of the Greenberg boat long before, and, while the petition alleges that it recognized this duty and endeavored to perform it, the proof shows that it did nothing of the kind.

Accordingly, I find a decree for libelant against the B. Turecamo Contracting Company, Inc., with costs. The libel is dismissed, with costs against the Moran Towing & Transportation Company. The petition is dismissed against the W. H. Gahagan, Inc., W. H. Gahagan Realty Co., Inc., and scow W. H. G. No. 10, without costs.