## THE PLAINFIELD.

### THE BARNEY TURECAMO.

**McLAIN LINE, Inc., v. GREAT EASTERN COAL CO., Inc., et al.**

No. 14905.

District Court, E. D. New York.

March 4, 1937.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libelant.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for respondent Great Eastern Coal Co., Inc.

Barber, Matters, Gay & Vander Clute, of New York City (Carl F. Vander Clute, of New York City, of counsel), for claimant-respondent-impleaded B. Turecamo Towing Corporation.

BYERS, District Judge.

Libelant's barge Plainfield laden with 483 tons of coal, less than two-thirds of her capacity, was delivered to the Great Eastern Coal Company, Inc., yard on the southwesterly side of Coney Island Creek on October 2, 1935. She was moored under the supervision of the yard-man of the Coal Company and grounded after arrival in such a posi-

tion that her midship portion was supported by the soft mud bottom, but her bow and stern were afloat, and she so remained from about one o'clock on October 2nd for the ensuing period of twenty-two hours and, as a result of the stranding, she took a hog; that is, her bottom planks were shoved upwards, and for the damage so occasioned this cause was instituted.

The libel was filed against the Coal Company and the faults alleged are: Failure to provide safe berth for the barge, allowing her to fetch up on the bottom; failing to move the barge, and failing to take into consideration weather and tidal conditions.

The respondent impleaded the tug Barney Turecamo and the B. Turecamo Towing Corporation on the theory that they should be held at fault for incompetence and for failure to deliver the Plainfield to the respondent's dock where she was consigned, and for allowing her to be left at or in front of a bulkhead other than that of the respondent, and for causing and allowing the barge to run aground, and leaving it in that condition.

It is found that the barge was not run aground by the tug Barney Turecamo but was left afloat, and this finding is based upon the testimony of the bargees of the Plainfield and the Egbert Petrie, and the yard foreman of Burns Brothers who was in a position to see and observe all that took place with reference to the arrival of the Plainfield.

The respondent's dock or bulkhead projects into Coney Island Creek, beginning at about West 19th street and continuing in an easterly direction to adjoining property not presently involved. The westerly face of the respondent's bulkhead is about 80 feet in length and on the morning in question the scow Egbert Petrie lay at the outboard end of this bulkhead head-on; the northerly face of the bulkhead, along which Coney Island Creek flows, was occupied by the scow Lillian Petrie which was undergoing discharge of her cargo of coal, and her stern somewhat overlapped the bow of the Egbert Petrie as she lay. There was a space of open water of about 50 feet between the starboard side of the Egbert and the bulkhead line which extends southwesterly from the westerly face of the Great Eastern bulkhead.

Burns Brothers' yard is westerly of the Great Eastern yard and on the morning in question three coal boats lay abreast alongside, at the Burns Brothers' bulkhead, extending out into Coney Island Creek about 80 feet; the offshore (starboard) side of the outer of these three boats lay about in line with the port side of the Egbert but astern by a matter of about 60 feet.

The tug Turecamo proceeded up the Creek with the Plainfield in tow and, when off the Burns Brothers' yard, the tug had the Plainfield alongside to starboard and, having reached a position off the Burns boats, blew a whistle for instructions as to the landing of the Plainfield. This was between 8:00 and 9:00 o'clock in the morning and high water occurred at about 10:30.

The Plainfield was not expected that morning, which clearly appears from the testimony of the vice-president of the respondent, and it is reasonable to infer that the presence of the two Petrie vessels, which has been described, rendered the handling of the Plainfield a difficult thing in view of the restricted space available for her mooring. It would have been better if the yard-man had directed the tug to take the Plainfield down to the City dock indicated on Great Eastern Exhibit 1, but perhaps that was not feasible; in any case the yard-man instructed the tug captain to warp the Plainfield into a position alongside the Egbert and this was done; that is to say, the Plainfield was moved alongside the Egbert about 8 feet off her starboard side, for a distance of about 50 feet measured on the Egbert; there the tug captain arrested the further progress of the Plainfield and stated that he thought it would not be safe to try to push her further toward the westerly face of the Great Eastern bulkhead.

The Plainfield is 107 feet long, has a beam of 26 feet and 12-foot sides, and she drew 7 feet forward and 8 feet aft.

In this position the stern of the Plainfield lay about 4 or 5 feet astern of the stern of the outboard coalboat lying at the Burns' bulkhead, and she was made fast to the Egbert by a bowline which ran to a midships cleat on the Egbert, and a stern line which was made fast on the stern of the Burns' boat just referred to. As has been stated, the testimony is clear that at this time the Plainfield was afloat and Wright, testifying for the respondent, is not clearly to the contrary. He said to the tug captain: "If that is as much as you can do, that is as much as you can do." The bargee on the Plainfield said his boat was all right, in response to the tug captain's

inquiry "O. K.?" and thereupon the tug left after waiting some ten or fifteen minutes alongside the Burns' vessels.

At about 1:00 p. m. (according to the bargee), Wright, the yard-man of the respondent, made fast a line at the bow of the Plainfield, running to a winch on the respondent's property, and tried to pull the Plainfield further ahead, but could not do so more than 30 feet because she seemed then to be "on a hump." Between 11:30 a. m. and noon, another tug had tried to move the Plainfield ahead by passing a line across the deck of the Egbert, the tug being outside of the latter, but this effort was unsuccessful.

Later the Lillian, having completed the discharge of her cargo, was moved away from the face of the Great Eastern bulkhead and the Egbert took her place, which left the Egbert's berth available to the Plainfield, and efforts were made at high water that night to move the Plainfield into the position vacated by the Egbert, but this could not be accomplished.

Finally on the following morning the Plainfield was moved under power of a tug.

It is found that the Plainfield was aground for a considerable portion of the time between one o'clock p. m. of October 2nd and 10:30 o'clock in the forenoon of October 3rd, and the question for decision is whether the respondent should be held for the damage so occasioned.

■ The testimony shows that dredging operations had been conducted alongside the westerly face of the respondent's bulkhead for the purpose of accommodating oil-carrying vessels in that berth, and this dredging was of a width of about 30 or 35 feet. Outboard of that area, apparently no dredging had been done, and only at high water could vessels of the Plainfield's draft, and more, move about as required in their ordinary pursuits. With knowledge of that condition, the respondent is chargeable.

■ The respondent contends that, because it has not been shown that the Plainfield rested on rocks or other obstructions, it is not answerable for this damage, because a laden coal barge is expected to be able to take a mud or sand bottom safely. It is thought that this argument is insufficient for the reason that, if it be assumed that the rule is as contended for, such a bottom at least must be uniform, and if that condition is not present, so that only a portion of the vessel can be supported on a falling tide, as in this case, leaving both ends free to sag under the weight of the cargo, the consignee supplying such a berth must be held responsible for the ensuing damage. See Hirsch Lumber Co. v. C. Ottaviano & Co., Inc. (C.C.A.) 18 F.(2d) 952, and cases therein cited.

There is a conflict in testimony as to when the efforts were made to move the Plainfield by a line made fast to the winch on shore, which is resolved against the respondent for the following reasons:

The time when the Lillian's discharge was completed has not been shown, and the yard was in a position to establish that clearly. Her shifting from the unloading crane fixed the Egbert's arrival there, and the consequent availability of the latter's berth, to the Plainfield. If those occurrences could have been established within an hour after high tide, say by 11:30 a. m. of October 2nd, there would be force in the argument that the stranding of the Plainfield took place on her arrival, since the depth available to her increased from 9:00 o'clock for at least the next two hours. But no such circumstantial evidence has been produced for the yard, from which its non-existence is inferred.

Something more was required of the consignee than its transparent showing of a preference for the tug's liability to its own.

■ There remains the question of whether the libelant should be held for half damages, because of the bargee's failure to take soundings on the Plainfield's arrival.

The duty of the bargee was as stated in Nassau Sand & Gravel Co., Inc., v. Red Star Towing & Transportation Co., Inc. (C.C.A.) 62 F.(2d) 356. See, also, Cities Service Transp. Co. v. Gulf Refining Co. (C.C.A.) 79 F.(2d) 521.

It is found that Wright, the yard-man, assured this bargee that the berth was safe, in effect, although not in precise terms. The cases do not prescribe any nicety of formula to govern such occasions.

It is the bargee's testimony that he did take soundings at 11:00 o'clock, and at once went ashore to the office of the respondent "and asked him if he was going to move out and they said when they got around to it. I said 'You had better get around there pretty quick, because it is going to be on the mud.'"

■ Since that testimony has not been contradicted, it must be accepted.

He made the soundings with an ordinary line with a bolt on it.

What more could have been expected from the bargee has not been made to appear.

Upon the entire case, the conclusion is that the libelant must have a decree against the respondent with costs, and that the impleading petition must be dismissed with costs.

Settle decree, and findings if desired, on notice.