WHITE STACK TOWING CORPORATION, a corporation, as owner and operator of the Tugs Tunker and F. L. Jenkins, Appellant,

v.

HEWITT OIL CO., a corporation, as owner of Hewitt Oil Terminals, in Charleston County, South Carolina, United States of America, as owner and operator of the USNS Mission Capistrano, and Tankers Company, Inc., a corporation, operating USNS Capistrano, as Agent for the United States of America, Appellees.

No. 6853.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 18, 1954.

Decided Nov. 10, 1954.

Charles H. Gibbs, Charleston, S. C. (Huger Sinkler and Sinkler, Gibbs & Simons, Charleston, S. C., on the brief), for appellant.

G. L. B. Rivers, Charleston, S. C. (Hagood, Rivers & Young and A. Baron Holmes, III, Charleston, S. C., on the brief), for appellee Hewitt Oil Co.

Harold A. Mouzon, Charleston, S. C. (Moore & Mouzon and B. Allston Moore, Charleston, S. C., on the brief), for appellee Tankers Co., Inc.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Hewitt Oil Company (hereinafter called Hewitt) brought an action in admiralty in the United States District Court for the Eastern District of South Carolina against White Stack Towing Company (hereinafter called White Stack) and Tankers Company, Inc., (hereinafter called Tankers) for damages to Hewitt's oil dock installations, alleged to have been caused by the negligence of White Stack and Tankers in connection with the docking of the USNS Mission Capistrano (hereinafter called Capistrano).

The District Judge found that "the dolphins in question were properly constructed and the damages were caused solely because of the negligent operation of the ship and the tugs" by White Stack, in charge of the docking operation. A decree was entered accordingly in favor of Hewitt against White Stack for $9,386.63.

About September 15, 1951, Hewitt had completed at its property on the West bank of the Cooper River, above the Navy Yard, at Charleston, South Carolina, an oil dock installation. This installation consisted of a comparatively small T-Head dock, four breasting dolphins and four mooring dolphins. The purpose of the dock was to carry the oil line or lines connecting the discharge equipment of the ship with Hewitt's storage tanks on shore, and to afford a means of access to and handling of the comparatively simple equipment used in connecting the pipe lines to a discharging oil tanker. The dock itself was not designed for and was not capable of mooring or docking a ship.

These eight dolphins were erected in order that the tankers, while docking, might moor and maintain correct positions at the Hewitt terminal. The four breasting dolphins were erected on a line approximately three feet out from the line of the T-Head extended roughly parallel with the river, two upstream and two downstream from the T-Head, located fifty feet apart. The end of the T-Head dock facing the channel is fifty feet long. Further inshore from the face of the dock and the line of the breasting dolphins were four mooring dolphins, two for breast lines and one each for bow and stern lines. There was no equipment whatsoever such as bits, chocks or cleats on the dock itself for tying up ships.

The District Judge, we think upon proper evidence, thus described the four breasting dolphins:

"These four dolphins were placed at the head of the wharf in a straight line to enable a ship to lay against them and were substantially new. Each pile was approximately 9½ inches on the tip and approximately 12 inches on the top. The breasting dolphins consisted of a core of one pile that was driven perpendicular and six piles driven around the center pile at a small batter or angle. These first seven piles were wrapped with ¾ inch cable and securely tied together. Twelve additional piles were driven around the center seven piles at a batter or angle to support the center seven piles against pressure that would be exerted on the four dolphins when the ship rested against the four dolphins. The batter of the outside twelve piles was on a ratio of two to twelve, that is, 12 feet down from the top of the dolphins each of the twelve piles would be 2 feet distant from the inside pile. All nineteen piles were driven in a distance of 15 feet and were rigid below the

surface of the marl as if set in concrete. Twelve piles were driven around the center piles and were secured around the dolphins to make the dolphins act as a unit. * * * Two of the breasting dolphins were located 50 feet and 100 feet north of the head of the wharf and other two were located 50 feet and 100 feet south of the wharf."

In the early morning of November 11, 1951, the Capistrano had been brought up the Cooper River. The docking of the ship at the Hewitt installation had been taken over by White Stack. For that purpose, White Stack furnished Captain Futch as Docking Master and two tugs to assist in the docking operation.

When the Capistrano was a short distance downstream from the Hewitt Dock, the Docking Master took over the ship and commenced maneuvering to get the ship alongside the docks, using both the ship engines and rudder and the two tugs of White Stack. The ship's Master remained on the bridge of the Capistrano with the Docking Master. The Docking Master actually gave the orders to both the ship and tugs, but the ship's Captain remained always in charge of his ship and retained the right throughout to countermand, in case anything occurred which in his judgment endangered his ship.

When the ship had its midship point approximately opposite the center of the T-Head of the dock and about thirty feet out in the river therefrom, the Docking Master commenced to breast her in sideways with the tugs. The bow of the ship was headed upstream. The tide was flooding about five feet above low water, velocity about two and one-half knots, in a direction somewhat diagonally across the ship and tending to push her shoreward and upstream. The wind was negligible, the weather fine, visibility good and no mechanical failures involving ship or tugs occurred. About fifteen minutes passed before the ship touched any shore installation. The uncontradicted testimony shows that the sideways speed of the ship was one-forty-fourth ($\frac{1}{44}$th) of one mile per hour while she was approaching the dolphins.

The Capistrano was what is known as a T-2 tanker, 523.5 feet long, 60 foot beam and loaded draft of 31 feet, 11 inches aft. The weight of such a ship, when loaded, is 25,000 tons. The sides of the ship are straight up and down in a vertical line for a distance of some 35 feet down from the main deck; at that point the sides turn rather sharply to form a somewhat flat bottom. This straight-sided condition does not exist, of course, near the bow or stern, where there is a more pronounced shear of the sides inward towards the ship's bottom.

During the docking operation, the Capistrano came against breasting dolphin No. 7, which cracked and fell over in the water away from the ship. This put the ship harder against breasting dolphin No. 6, which also fell over. The port side of the ship scraped the corner of the T-Head of the dock. It was stipulated that the damage to the breasting dolphins and to the dock amounted to $9,386.63.

In holding White Stack alone liable for the damages, the District Judge stated:

"I find that since the USNS Mission Capistrano struck the stationary dolphins and the wharf the presumption of negligence arises against all persons operating the moving vessel. * * * The respondents in this case have failed to overcome the presumption of negligence * * *. Even if there were no presumption of negligence in this case, I find that the testimony conclusively shows that the respondent White Stack Towing Corporation was guilty and that the libellant would be entitled to recover against it even in the absence of a presumption."

■ We think the District Judge erred in these conclusions. It is our view that there was no negligence in the docking of the Capistrano and that the damages here were due solely to the faulty construction of the breasting dolphins. We are doubtful whether the pre-

sumption attaches here, since the breasting dolphins were designed for the very purpose of being brought into contact with the docking ship and thereby having the ship held fast. We reach our conclusion on the ground that the record affirmatively shows that there was no negligence in the docking operation and that the faulty construction of the breasting dolphins alone caused the damages.

Practically all the evidence of negligence in the docking was that of Morgan Hewitt, manager of the terminal installations and brother of Batson Hewitt, President of Hewitt. Morgan Hewitt was standing on the T-Head of the dock as the Capistrano approached. He testified that the Capistrano approached the dock sideways at an angle, with the stern closer in than the bow. He did not define the extent of this angle, though he stated that the point of the Capistrano opposite breasting dolphin No. 3 was about twenty-five feet out from this dolphin when the after part of the ship first touched breasting dolphin No. 7. According to his testimony, at the time the ship first touched breasting dolphin No. 7, the ship's crew dropped a line on breasting dolphin No. 6 because No. 7 had normally given away enough so that the ship was either "real close to" No. 6 or "up against" No. 6. After that, he stated that after the line was dropped on No. 6, two men in a rowboat from one of the tugs came from around the bow of the Capistrano, rowed against the tide down to No. 3 dolphin, climbed up No. 3 and put a line from the ship to it, climbed down and rowed against the tide to the stern of the ship, took the stern line from the stern, rowed further against the tide to mooring dolphin No. 8, climbed up and put the stern line on No. 8.

As soon as the peril became apparent, corrective measures were promptly taken by the Docking Master and the ship's Captain. The stern line of the ship was ordered chopped off so that the ship would be free to move out and avoid having the stern swing in shoreward and go aground. The engines of the Capistrano were put ahead with left rudder and the tugs were ordered to pull outward. In spite of these precautionary measures, the port side of the Capistrano, on its outward way, scraped the corner of the T-Head of the dock. Afterwards, there was some scraped paint on the port side of the ship where she scraped the corner of the dock.

The most favorable evidence of Hewitt bearing on negligence in docking the Capistrano was that of Morgan Hewitt, an eye-witness who was on the dock. Kimes, Hewitt's other witness, did not arrive on the scene until after the smashing of the breasting dolphins. If we accept Morgan Hewitt's testimony at its strongest, the angle made by the side of the ship, as it approached the breasting dolphins, and the line of the breasting dolphins was only a shade over seven degrees. Hewitt's expert witness, Johnson, testified that it was not possible to line up four dolphins in a perfectly straight line and further that it was humanly impossible for a Docking Master or anyone else to make an exact four-point landing on all four dolphins. The ship, he explained, will touch one dolphin first, "and that gives a little and then you come along to the next one, and you gradually get alongside." This was confirmed by Docking Master Futch and Captain Amondsen of the Capistrano. White Stack's witnesses testified that the landing was substantially parallel to the line of the breasting dolphins. The bar pilot, Poulnot, a disinterested witness, testified to the same effect and stated that Futch had the reputation, in docking ships, of "using more caution than necessary."

At the time of the accident, there was nothing abnormal in wind, tide or weather; there was no mechanical failure on the ship or tugs, the ship was approaching at an exceedingly slow speed (one forty-fourth of a mile an hour); the angle of approach (as has been shown) was at best around 7°; and nothing unforeseen, nothing unexpected, occurred until breasting dolphin No. 7 fell over. Under these circumstances, we must hold

that there was no negligence on the part of those in control of the Capistrano.

 If, as we have held, there was no negligence on the part of those docking the Capistrano, they would naturally be relieved of any liability for the injury to the breasting dolphins and the wharf. This same lack of negligence would indicate faulty construction of these dolphins. We go further to hold that the method of erecting these dolphins, as found by the District Court, in the light of this record, indicates such negligence in the construction of the breasting dolphins on the part of Hewitt.

The evidence, we think, shows that in breasting dolphins properly constructed the outstream side of the dolphins should be virtually vertical to the bottom. Then, the shock and strain caused by the ship on touching the dolphin would be spread over practically the entire outstream side of the dolphin. For the side of the ship would simultaneously come into contact with the dolphin with its entire side touching the dolphin.

But here, piles set at an angle under water to brace the dolphin on its outstream side would be touched by the under-water side of the ship one at a time. And a single pile would quite naturally be broken by the weight of a ship of 25,000 tons coming against it. That, it seems to us, is just what happened in the instant case. Of course, as each pile breaks, the entire dolphin is weakened and reduced in its strength and power of resistance to the ship.

There was evidence here that the breasting dolphins in other installations around the harbor of Charleston were constructed quite differently from Hewitt's breasting dolphins. There was, too, expert testimony that the river (or outstream) side should consist of vertical piles strongly braced from behind by a suitable number of piles slanted out on a batter or angle. And the faults, as we have indicated, of the cone or tent-like structure used in the breasting dolphins of Hewitt were clearly pointed out.

Only one ship, the Muir Woods, had been docked at the Hewitt installation prior to the docking of the Capistrano. There was, too, some evidence that the Muir Woods had trouble with these breasting dolphins and might have injured them. No inspection was made by Hewitt to ascertain the nature or extent of this damage, if any. We do not, however, rely to any appreciable extent upon this evidence as to the Muir Woods.

For the reasons indicated, the decree below must be reversed. The case is remanded to the District Court with instructions to dismiss the libel.

Reversed.