RELIANCE MARINE TRANSPORTATION & CONSTRUCTION CORPORATION, as owner of THE ELIZABETH JORDAN, Libelant,

v.

MICHAEL SCHIAVONE & SONS, Inc., Respondent.

No. 4564.

United States District Court
D. Connecticut.

Dec. 27, 1957.

5. Giles v. Western Air Lines, Inc., D.C. Minn., 73 F.Supp. 616.

122

Jeremiah D. Shea, New Haven, Conn., Frank C. Mason of Mahar & Mason, New York City, for libelant.

Edward J. Brennan, New Haven, Conn., Thomas H. Middleton (of Hill, Rivkins, Middleton), Louis & Warburton, New York City, for respondent.

J. JOSEPH SMITH, Chief Judge.

■ Libelant's barge Elizabeth Jordan was alongside respondent's dock on the Quinnipiac River at New Haven to take on a cargo of 800 tons of scrap iron. On June 7, 1956, after she was partly loaded with some 150 tons of scrap respondent's employees shifted her sternward about 25 feet to facilitate loading through the forward hatches. This placed her starboard stern over a shallow area of the bottom on which there were rubble and scrap bales. Since the tide was falling, the barge was caused to ground on this area, seriously twisting, straining and damaging her members. She was twisted 24″ and hogged 9″. Placing the barge at this point on this tide was negligence on the part of the respondent. The barge captain was not familiar with depth of water at respondent's dock, never having been there before, and was not negligent in relying on respondent's employees' knowledge of conditions.

■ The most troublesome issues are contributory negligence and damages. Had the barge been dropped off by a tug in the position where she grounded, protruding beyond the end of the wharf, reasonable care might well have required soundings by the bargee. Where she was moved by the wharf owner and operator, in the course of loading, however, it would seem that the bargee could rely on respondent's knowledge of conditions at its own wharf.

The barge was built in 1929 of exceptionally heavy construction and was lined for dry cargo trade. She had suffered several casualties over the years, but had been kept in reasonable repair and was at the time of the grounding still in condition for use in the dry cargo trade, although repairs were necessary to correct some damage sustained in her previous voyage. The evidence is in wide conflict regarding her condition and value prior to the grounding, and the cost of repairs necessary to put her back in reasonable shape thereafter. Respondent relies largely on Hargan's testimony on her condition before the accident. This proved to be worthless, however, in view of his carrying over many items of damage from previous surveys since which very extensive repairs and improvements had been made. Respondent's present claims as to her condition before the accident are also of doubtful

standing in view of Hargan's passing her for carriage of scrap the day before (June 6).

■ The chief measure of damages would ordinarily be the cost of repairs necessary to place her in the same condition as before the casualty. There are two recognized exceptions to the rule, where the cost of repairs exceeds her value before the casualty, in which case the value is the measure, and where, particularly in an old vessel, much less expensive methods of repair and strengthening give a practical result comparable to full replacement of damaged parts.

Here the low bid for repairs was $24,-661. Value is claimed to have been $23,-000. The barge was sold inter-familias for $1,250 and repaired by the purchaser for $11,741.61, making her useable for carriage of scrap, but not, it is claimed, for dry cargo. Admittedly she needed repairs to her ceilings because of a May 1956 accident at an estimated cost of $4,492 which I take it would have been necessary in any case to return her to the dry cargo trade, so it has been argued that she is in substantially the same shape as before the casualty. However, additional work not caused by the earlier accident including some that requires removal and replacement of the steel decking is apparently still necessary for full restoration to her ability to carry dry cargo.

■■ So far as damages are concerned we may well consider her a total loss since the repairs actually made were not sufficient to restore her to use as a dry cargo vessel. The damages would therefore be her value at the date of the casualty, less the salvage of $1,250, plus the expense of towage and survey, plus lost freight on the voyage, plus interest. We have two opinions of value based on reproduction cost depreciated less the damage suffered at Lackawanna prior to the grounding. Of the two, DeMars' seems more reliable, for he considered

the actual type of construction of this barge, not one somewhat different, and Finkenaur's change of factor was without plausible explanation. The barge was built for Jordan in 1929 at a price of $60,250, purchased from Jordan in 1948 at a price of $1,006.20, repaired at a cost of $6,600, fire damage to cabin and deck later suffered repaired at a cost of $4,000 or $4,500, maintenance, major repairs and replacements in the three years before the casualty in suit amounted to $15,600. Feeney estimated the value in damaged condition when bought in 1948 at between $4,000 and $5,000. She was capable of earning $2,250 net on a twenty day trip up the canal, $450 net on a 10 day return trip, carrying iron, substantially more if carrying flax. DeMars' figure of $23,000 net may seem high in view of her age and cost to Feeney, but she did have substantial earning capacity. Damages are therefore $23,000 less $1,250, or $21,750 plus $2,251 lost net freight, plus survey fees $336, towing $340 and $135 and drydocking $131.53, $24,943.53 with interest from the date of payment in each case, and costs.

### Findings of Fact

1. At all the times hereinafter mentioned libelant was a corporation organized and existing under and by virtue of the laws of the State of New York.

2. At all such times libelant was the owner of the barge Elizabeth Jordan herein referred to.

3. Up to the time of the happening herein referred to the said barge Elizabeth Jordan was in all respects tight, staunch, strong and seaworthy.

4. The above named respondent at all such times was and still is a domestic corporation organized and existing under and by virtue of the laws of the State of Connecticut.

5. On June 7, 1956, the said respondent operated and maintained at New Haven, Connecticut, certain premises at which it engaged in the scrap iron busi-

ness, including the dock structure and adjacent berths.

6. On June 7, 1956, about 9:00 a. m., respondent started loading baled scrap in the after hatches of the barge. About 11:00 a. m. respondent's employees, by dropping a magnet in the barge and swinging the magnet crane, moved the barge sternward about 25 feet to enable respondent to load through the forward hatches. Prior to moving, the starboard stern of the barge was even with the up-river end of the Schiavone dock in water with a minimum depth of 7.7 feet at mean low water. After the move, the starboard stern corner was over bottom which was later exposed at low tide. The bottom at this point had imbedded in it at the time chunks of concrete and bales of scrap iron. The tide was falling. Loading continued in the forward holds until 12:00, when the men stopped for lunch, continued at 12:30 for about half an hour, approximately 150 tons having been loaded, when it was discovered the barge was aground at the starboard stern corner. Loading was halted and efforts were made to pull the barge off by a line to the crane, which were unsuccessful. The tide continued to fall and the barge was seriously damaged, twisted 24″ and hogged 9″, with rupture and displacement of many members.

7. The grounding of the barge and its damage were caused by the negligence of respondent in moving it so that its starboard stern corner was placed in shallow water over hard bottom on a falling tide.

8. Libelant's bargee was not negligent in relying on respondent's knowledge of conditions at its dock.

9. The barge was floated on the next tide, and later emptied and towed to New York and thence to Kingston, dry-docked and surveyed.

10. The barge had a fair value of $23,000 at the time of the grounding.

11. After the grounding the barge had a salvage value of $1,250.

12. Repairs to restore the barge to her condition prior to grounding would have cost more than $23,000.

13. Libelant's surveyor DeMars rendered service in the survey reasonably worth $336, which sum libelant paid on December 13, 1956.

14. Libelant incurred expense of towing from New Haven to New York in the amount of $340, paid September 22, 1956, and from New York to Kingston, $135, paid September 13, 1956, and drydocking for survey at Kingston, $131.53, paid September 13, 1956.

15. The libelant lost net freight for the voyage on which the barge was loading when damaged in the sum of $2,251.

16. Libelant's total damage is the sum of

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $21,750 | with interest at 6% from June | 7, 1956 to date of judgment | | | | | |
| plus | $ 2,251 | " " " " " | July | 7, 1956 " " " " | | | | |
| plus | 336 | " " " " " | Dec. | 13, 1956 " " " " | | | | |
| plus | 340 | " " " " " | Sept. | 22, 1956 " " " " | | | | |
| plus | 135 | " " " " " | Sept. | 13, 1956 " " " " | | | | |
| plus | 131.53 | " " " " | Sept. | 13, 1956 " " " " | | | | |

Conclusions of Law

1. The court has jurisdiction of the parties and subject matter of the action.

2. Libelant is entitled to recover damages for the damage suffered through respondent's negligence, in the amounts set forth in paragraph 16 of the Findings; and its costs.

3. Respondent is not entitled to reduction of damages by reason of any negligence on the part of libelant.

Enter decree accordingly.