It is so ordered.

**RED STAR BARGE LINE, Inc., as owner of THE Scow, SEABOARD NO. 60,** Libelant,

v.

**LIZZA ASPHALT CONSTRUCTION CO., Inc., Respondent.** and **New York Trap Rock Corporation, Respondent-Impleaded.**

No. 20333.

United States District Court E. D. New York. July 3, 1958.

Foley & Martin, New York City, proctors for libelant, by Edward J. Ryan, New York City, Advocate.

Symmers, Fish, Warner & Nicol, New York City, proctors for respondent, by William Warner, New York City, Advocate.

Hagen & Eidenbach, New York City, proctors for impleaded respondent, by Nelson J. Johnson and John F. Quarto, New York City, Advocates.

BYERS, Chief Judge.

The scow Seaboard No. 60, owned by the libelant, suffered interior structural damage on May 27, 1954 as the result of grounding off Oysterman Dock, in Oyster Bay, Long Island. She was carrying a cargo of about 750 tons of crushed stone consigned to the respondent, which operated a pier where delivery was taken. The libelant has elected to sue the respondent directly instead of the charterer of the scow, for undisclosed reasons.

The stone had been purchased from New York Trap Rock Corporation, respondent-impleaded, and the contention offered by the respondent in order to escape liability, comes down to the assertion that because the respondent-impleaded had been asked not to deliver more than three scows at a time at this place at any time, it must be held responsible for the injury to the libelant's barge, for having departed from the terms of that general request.

No such specific request had been made in connection with this or any immediately prior delivery.

The fact of grounding is not contested, and while the incidence of damage is faintly questioned, the evidence adduced by libelant on the subject is not contradicted.

It is therefore found that the claimed damage did in fact occur.

The circumstances are briefly as follows:

The pier in question is about 340 feet long, and was used by respondent for the receipt of cargoes of crushed stone which were discharged from scows placed alongside, by the use of a mobile crane and bucket, operated by the respondent.

At about 1:40 a. m. of May 27, 1954, the libelant's scow No. 60 was brought to the pier by a Red Star tug and placed alongside the libelant's scow No. 61, both lying bow in; this means that the starboard side of the No. 61 was alongside the pier, and the starboard side of the No. 60 was alongside the No. 61.

As these vessels were made fast, the bow of the No. 60 was about amidships

of the scow No. 61. As to the latter, discharge of its cargo had begun on the day previous but had not been quite completed at the arrival of the No. 60.

At that time the scow Cleary No. 74 lay astern of the No. 61, with the scow Kelleher astern of the Cleary No. 74.

When the No. 60 was being warped into position, it was thought that she touched bottom at her starboard bow corner, and before the landing had been completed she was moved somewhat astern to assume the position with reference to the No. 61 above described. If there was such a touching, no damage to the No. 60 resulted.

By reason of the nature of the cargo of stone being carried by the Kelleher, it became necessary to discharge the latter, prior to undertaking the discharge of the No. 60. To accomplish that purpose, both the No. 60 and the No. 61 were pulled laterally by an ingenious operation of the boom of the crane and the bucket falling therefrom, outboard from the pier; by this time the bows of the No. 60 and the No. 61 were in line, the No. 60 being the one furthest away from the pier.

As the result of that operation the No. 60 grounded, and although no damage was at once discovered, her bargee Olsen later became aware that there was trouble below due to the falling of the tide; he heard sounds of cracking of the timbers, and using a flashlight he discovered two broken kelsons, one or more broken stringers, and bent tie rods. This was at about 1:30 p. m.

The rise and fall of the tide in these waters is about seven feet, and high water occurred at about 6:45 a. m. Therefore it is important to note that the movement away from the pier which has been described, occurred at about 9:30, which means that the tide was falling at that time, and so continued until around 1:00 o'clock in the afternoon.

There is no dispute over the fact that the moving of these two scows was performed by the crane operator, Bondi, and therefore the operation was that of the respondent.

The relation of buyer and seller between the New York Trap Rock Corporation and the respondent, is established by a contract in evidence dated January 4, 1954, which tabulates prices to be paid by the respondent for the various grades and kinds of crushed stone.

At the foot of that tabulation, the following appears:

"A/s safe 10 ft. water draft dock, Oyster Bay, Long Island, New York."

The reverse side of the contract contains the following printed paragraph:

"2. The prices quoted are in all cases, unless otherwise specifically noted herein, for delivery by boat alongside safe docks or landing places to be provided by you having at least 10 foot draft."

Recurring to the grounding itself, the testimony of the bargee is not contradicted that he discovered his vessel to be aground soon after the lateral movement above described, and at once reported the fact to Bondi; in reply, Bondi endeavored to pull the No. 60 clear by the use of lines rigged across to the pier, and the operation of a truck; the effort was unsuccessful, and in the course of making it the first line carried away and a replacement of it was of no avail.

Up to that time Olsen had not discovered any damage to his scow, or leaking; but just before 2:00 o'clock, which was probably around dead low water, he did find the conditions above described and went ashore and reported over the telephone to his runner that the scow was taking water; that it was on the bottom and was listing to starboard; also that he heard the snapping and cracking and observed the broken kelsons, etc.

Then Olsen made soundings along the side of his scow and discovered that she was grounded on a hard bottom as to nearly a third of her length.

Olsen was corroborated with regard to the telephone call to his runner; it is not suggested that he would have had any

occasion to do that except in connection with the condition of his scow.

The No. 60 was later hauled clear by a tug, was returned to her berth, discharged, and then towed to the Bushey Yard where a survey of damage was held.

The evidence as a whole leaves the court in no doubt that the grounding took place substantially as stated, and that it caused the damage which has been recited. It is therefore so found.

The respondent has not sought to discredit the provisions of the contract above quoted, which means that according to its engagement, it undertook to provide a proper berth for a scow drawing ten feet.

It is uncontradicted that the No. 60 in her loaded condition did not exceed a draft of ten feet astern, and nine feet at the bow.

It is therefore found that the respondent did not live up to its contractual undertaking so far as the scow No. 60 is concerned, on May 27, 1954.

■ The telephone and other oral representations to the New York Trap Rock Corporation somewhat indicated by respondent's witnesses, concerning the desired restriction that no more than three scows should be delivered at any time because of the limited facilities at the dock, are found not to have established an amendment to the said written contract. The showing at best is of an informal talk or two which fell short of a clear understanding between the parties whereby the contract was amended.

The evidence is convincing that the handling of this business between the parties would not admit of a precise schedule concerning deliveries, by reason of such intervening causes as weather conditions, varying requirements of respondent's business, and other practical obstacles.

The result is that the respondent's efforts to cast upon the respondent-impleaded responsibility for the grounding of the libelant's scow, are held to be legally inadequate to support the respondent's defence.

■ The respondent urges that it can only be held liable if it be shown that it was negligent in moving the scow No. 60 as far from the pier as the evidence shows that it did.

■ These scows are each about 120 feet long and have a beam of about 36 feet, so that the No. 60 was moved laterally away from the pier at least 75 feet; while the testimony is convincing that a similar expedient had been resorted to on prior occasions without apparent damage, it is also clear that some outermost vessels in that position went aground, to the knowledge of the respondent. The latter is shown to have relied upon the bottom at that distance being of soft mud, and hence it was expected that scows moved into that position would always escape damage. Without details concerning such prior experiences, it cannot be held that respondent was justified in this instance. Those occasions do not relieve the respondent of whatever risk there was involved in this particular maneuver, because the presence of the hard ridge on which the No. 60 did in fact rest, was a hazard that should have entered into its calculations, since it had control of the positions of these vessels when they were being discharged.

That a consignee under such circumstances is responsible for ensuing damage to a vessel, consigned to it, see The Eastchester, 2 Cir., 20 F.2d 357; New York Trap Rock Corp. v. The Metropolitan No. 4, 2 Cir., 128 F.2d 831; Goodwin-Gallagher Sand & Gravel Corp. v. Washington Bulkley, D.C., 31 F.2d 112; The Murray River, D.C., 38 F.2d 990; The Plainfield, D.C., 18 F.Supp. 416; and Reliance Marine Transp. & Const. Corp. v. Michael Schiavone & Sons, D.C., 161 F. Supp. 121.

## Conclusion of Law

The libelant is entitled to the usual interlocutory decree against the respondent, with costs, and the impleading petition as against respondent-impleaded is dismissed, with costs.

Settle decree.