## BUNGE CORPORATION
### v.
**MV FURNESS BRIDGE, her engines, tackle, apparel, etc., in rem, Furness Withy & Co., Ltd., in personam.**

Civ. A. No. 74-1656.

United States District Court,
E. D. Louisiana.

May 23, 1975.

---

John Blackwell, New Orleans, La., for plaintiff.

J. Dwight Le Banc, Jr., New Orleans, La., for defendants.

ALVIN B. RUBIN, District Judge:

The Father of Waters had been navigated by Indian canoe and pirogue, log raft and paddle wheel, submarine and cargo ship, but it had never accommodated anything the size of the M/V Furness Bridge. On January 15 and 16, 1974, this 965 foot vessel, largest ever to enter the river,[1] attempted to berth at the Bunge docks on the left descending bank of the river near Destrehan. It nudged a mooring dolphin, causing barely perceptible damage to the vessel, leaving a score mark a few feet long. But the massive force caused an alleged $100,000 in damage

to the dolphin. Invoking the presumption, long established in admiralty, that, when a vessel strikes a wharf or other fixed object, which stands mute and defenseless, the vessel is at fault,[2] the owners of the dock seek to recover the damages. But the vessel's owners say there is more to the story than that, and the case cannot be decided by simplistic presumptions. Here, then, are the other facts.

I.

Bunge owns and operates a grain elevator and dock. The dock consists of a steel piled wharf with five mooring dolphins, two located upstream of the wharf and three located downstream of the wharf. The total distance between the dolphins is 820 feet. The dolphins are recessed about 2 feet from a line that would run along the face of the wharf, do not serve as breasting dolphins, and do not have fenders. There should be no contact between them and a ship entering or leaving the dock. The positions of the mooring dolphins as well as the fact that they do not have fenders is obvious, at least in day light, as they are in plain view.

Bunge's wharf has an area capable of withstanding breasting forces 470 foot long. If the dolphins were capable of withstanding a breasting force, they would add to the frontage against which a vessel might breast; but, as they stand, they do not. In addition, since their maximum span is 820 feet, they afford no facility for putting out lines fore and aft of the vessel itself.

The wharf was designed only to accommodate vessels under a displacement tonnage of 33,750 tons, mooring at a velocity of ¼ of a foot per second (less than one mile per hour), and approaching the wharf at an angle of

---

1. The Furness Bridge had 91,079 tons gross registered tonnage, and 166,064 dead weight tons. The Manhattan, a larger ship, had been upriver sixteen months before, but it had somewhat less gross tonnage.

2. Ford Motor Co. v. Bradley Transp. Co., 6th Cir. 1949, 174 F.2d 192; Humble Oil and Refining Company v. S.S. Napier, S.D.N.Y. 1967, 1968 AMC 448; Sabine Towing & Transportation Co. v. St. Joe Paper Co., N.D. Fla.1958, 297 F.Supp. 748.

10 degrees or less. By contrast, the Furness Bridge displaced 112,000 tons.

The Furness Bridge is more than twice as long as the wharf; its length and bulk make great care necessary in berthing it, for the unprotected dolphins are not designed to take breasting forces. Elementary geometry demonstrates that a vessel twice the length of the wharf may strike one of the dolphins if it approaches at an angle of 3 degrees, while a 400 foot vessel would have to approach at a greater angle or miss the wharf completely before striking the dolphin.

The Furness Bridge was under the exclusive custody and control of employees of Furness Withy; it was operating under a time charter to Seabridge, who voyage subchartered to Bunge. Both charters contained "safe berth" clauses but the Bunge-Seabridge charter did not incorporate the Furness Withy-Seabridge charter nor did Bunge make any independent stipulations in favor of Furness Withy.

During the daylight hours of January 15, 1974, the Furness Bridge was lying upriver from the Bunge dock. Toward the end of the day, Bunge ordered the vessel into berth that night. The master objected and asked that he be permitted to wait until morning. Bunge replied that, if the vessel was not ready to berth at night, it would be taken off hire until it proceeded. The master then undertook to attempt a berth.

What happened during the berthing is much disputed but I am persuaded that a preponderance of the credible evidence indicates that Bunge gave only the rudimentary instruction about berthing procedures; it informed the vessel that the custom was to drop both anchors upriver of the berth, then drop back and dock alongside. The owner's agent sought no instructions as to whether three or four tugs were needed; having docked at New Orleans with three, having no warning that this number would be insufficient, he ordered three. Hindsight demonstrates that using four would have been much safer.

The Furness Bridge was navigated stern first downriver, using the current, and maneuvered in crab-fashion towards the dock, using lines and cables. When it was about fifty feet off the dock it began to move into the berth. A line was put ashore from the bow to the upstream dolphin. A few minutes later the aft line was put ashore. As the vessel moved in the river the fog increased, obscuring visibility at the river level, although the lights atop the docking facility were clear. The vessel was moving forward and upriver toward the dock, at an angle of less than 5°, when the starboard side of the bow struck the upriver dolphin. At the time the vessel was moving at a slow speed, using considerable caution.

The vessel thereafter completed berthing and was moored alongside fore and aft at 0025 hours on January 16, 1974. However, she had to keep one tug in attendance at all times to keep her bow next to the wharf. In spite of these efforts, she broke away from the wharf at approximately 2020 on January 16. During the time the vessel was alongside, she pulled 4 bollards or cleats off the Bunge facility.

The M/V Furness Bridge redocked a day later in daylight using 4 tugs. This time the docking was without incident.

## II.

It is evident that larger vessels require more space and time to turn or to stop, and the exercise of more care in berthing than smaller vessels. But the difference in size creates differences of vast degree. The kinetic energy of a vessel increases proportionally with its displacement multiplied by the square of the speed.[3] Hence the force

3. Ringdal, Some Liability Aspects of Navigation and Berthing of Very Large Tankers, Lecture given at the 5th Scandinavian Maritime Law Seminar, Sandefjord, Oct. 12, 1972, at 159.

of impact from the larger vessel becomes massively larger.

Angles and distances perfectly safe when a vessel relatively small in relationship to a dock is coming alongside threaten damage when the size of the vessel substantially exceeds the size of the dock. In such instances, if the vessel is ordered to berth at a dock in a certain manner, and damage either to the vessel or dock results, this may be caused by negligence on the part of the vessel or on the part of the berthing master, or both.

> Negligence by the vessel in berthing invariably involves approach speed and angle. Traditionally the vessel encounters an insurmountable handicap: When the mishap occurred the berth was at rest—the vessel was in motion. In the U.S.A. this simple fact has led to a legal presumption of negligence against the vessel, but that does not really solve all problems.[4]

In order that a tanker may berth with a minimum risk of damage to ship and shore installations, four criteria must be met:

1. The berth must have a sufficiently solid construction, and must be adequately dimensioned to receive a large vessel under defined approach conditions.

2. The berth must not have defects, weaknesses, or previous damages that render the applicable berthing criteria untenable.

3. The berthing instructions and procedures for the particular vessel, established on the basis of the shock absorbing ability of the berth structure, must have been clearly and correctly defined, and the vessel must have been properly notified about the relevant factors.

4. The vessel must receive the necessary assistance and cooperation from the shore that will enable

her to meet the berthing requirements.[5]

Hence, under English law, a quay owner, inviting a vessel to use his quay, must exercise due diligence to ascertain whether it can berth safely without suffering damage.[6]

### III.

A considerable part of the preceding discussion cites as authority a single paper delivered at a Scandinavian maritime law seminar. If this were relied upon as legal authority, its value might well be questioned. But the forces of physics are as universal with respect to matter as logic is with respect to reasoning.

Ships and wharves are old. The legal concepts that govern their relationships, taking into account their respective sizes, are traditional and also ancient. But the concepts must be adjusted to meet the new technology of vessel construction. Supertankers may call for super precautions on the part of those who invite them to berth at facilities designed for lesser vessels. The owners of structures available for public use have a duty to act prudently. The owner knows the design features and shock absorbing capacity of the berth. The owner knows hazards not fully perceived by the mariner even though the physical objects creating them may be in plain sight. A fortiori, the owner knows the hazards not clear at night or in fog.

Bunge asserts that the only relevant issue is whether the size of the vessel compared with the size of the wharf made damage to the wharf the logical outcome of a proper docking. It is impossible to accept this dogmatic statement. The issue is whether the berth owner was negligent under all the circumstances, either by doing something it should not have done or by failing to do something that, considering its knowledge and facilities, it should have done. Extra care is due when the

---

4. Id. at 157.

5. Id. at p. 157, 158.

6. Id. at p. 160.

chance of damage is great even though mishap is not inevitable. The wharfinger is not entitled to expect a perfect berthing but only a normal one. If a normal berthing may create risk, extra care is required.

That, with the benefit of hindsight, daylight, and four tugs, the Furness Bridge made a subsequent docking without damage is not proof that only vessel negligence accounted for the mishap in the earlier night. The expert witness called by the vessel gave credible and convincing testimony that the facility was not adequate for vessels the size of the Furness Bridge. Literally, a thousand smaller vessels have docked at the facility since it was constructed without damage, but this proves nothing but the correctness of his testimony; the wharf was adequate for a smaller ship.

Only three vessels of mammoth size have used the facility. The Furness Bridge had the greatest tonnage. The Manhattan, which arrived without problem, was even longer, but somewhat lighter. The Ultramar, a vessel only slightly smaller than the Furness Bridge, also had docking problems.

It will not do to draw easy parallels between a 600 foot vessel or a 700 foot one, or even an 800 foot one, and a vessel 965 feet long. The extra 165 feet is itself the length of a seagoing vessel. The super vessel not only is longer; it is greater. Every 100 feet of extra length creates greater cubic size; every additional 10,000 tons creates greater mass and larger kinetic forces

## IV.

The wharfinger's duty to use due diligence to provide a safe berth is well established. Not of course an insurer, the wharfinger owes merely the duty of reasonable diligence. Berwind-White Coal Mining Co. v. City of N.Y., 2d Cir. 1943, 135 F.2d 433, 445. See also Schwerman Trucking Co. v. Gartland Steamship Co., 7 Cir. 1974, 496 F.2d 466. The wharfinger is obliged "to warn a ship of any unexpected hazard or deficiency known to the wharfinger, or which, in the exercise of reasonable care, he should have known." Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc., 4 Cir. 1966, 354 F.2d 476, 480. As that case points out, what constitutes a "safe berth" cannot be categorically described; it is simply one that is reasonably safe under the facts and circumstances of each case. A particular ship must be able to reach the berth, use it, and return from it without being exposed to danger that cannot be avoided by good navigation and seamanship. This is in accord with the view taken in Smith v. Burnett, 1899, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756, where the shipowner sued for damage done to the vessel by a submerged rock that the wharfinger had negligently allowed to remain in the bed of the river within the limits of the berth at the wharf. The Court said that, if the wharfinger has knowledge that the place for unloading is improper, he should adopt one of several courses. He should either not invite the vessel to dock at the inadequate facility or he should inform the vessel of the condition of things when she is invited to dock so that injury may be avoided. See also White Stack Towing Corp. v. Hewitt Oil Co., 4th Cir. 1954, 216 F.2d 776.

Cases that are rigged exactly like the present one have not been found. The point is new. Authorities are cited merely to demonstrate the principle; the wharfinger has the duty of exercising such care as a prudent person would under like circumstances. Here the evidence shows that it did not. It failed to give full caution about the size and structure of the wharf, about the hazards to the unfendered dolphins just a short distance past the line of the wharf, about the need of so large a vessel using four tugs, and it urged berthing at night.

Much has been made in briefs about whether, since Bunge subchartered the vessel under a charter party containing a safe berth clause, it had a contractual

obligation to provide a secure berth. The clause is in customary terms; it obliges the vessel to discharge cargo "at any wharf or place that Charterers or their Agents may direct, provided the vessel can safely be always afloat at any time or tide." Furness Withy argues that the clause implies a duty by the charterer to furnish a safe berth and imposes liability for its failure to do so, and that Bunge is obligated to Furness Withy by it because the charter to Seabridge contained the same clause. Bunge not only disputes this interpretation of the contract; it contends that, whatever its contractual obligation, the duty was due only to Seabridge; it had no contract with Furness Withy.

At least on its face the safe berth appears merely to exonerate the owner from any duty to berth the vessel at a place its master deems unsafe. There are authorities that read the clause more broadly, and find that it implies a contractual duty to provide a completely safe berth. See, e. g., Venore Transportation Co. v. Oswego Shipping Corp., 2d Cir. 1974, 498 F.2d 469; Paragon Oil Co. v. Republic Tankers, S.A., 2d Cir. 1962, 310 F.2d 169; Park S.S. Co. v. Cities Service Oil Co., 2d Cir. 1951, 188 F.2d 804; Athina Shipping Co. v. Amerada Hess Corp., M.D. Fla. 1971, 1972 AMC 796; Universal Tramp Shipping Co. v. Irish Salt Mining Co., D.Mass.1970, 1970 AMC 1783; Red Star Barge Line, Inc. v. Lizza Asphalt Construction Co., E.D.N.Y. 1959, 164 F.Supp. 97, aff'd. 2d Cir. 1959, 264 F.2d 467. But some at least take the view that the clause means merely what it says and does not operate to shift to the wharfinger liability that would otherwise attach to the vessel. See Gilmore & Black, The Law of Admiralty § 4–4 at 204 (2d ed. 1975).

Under the circumstances of this case these authorities appear not to be controlling. But what is important is that Bunge, being a subcharterer, knew the precise characteristics of the vessel. Bunge also knew of the current in the river, the layers of river fog, the visi-bility problems encountered in docking at night, and the exact limitations of its wharf. It failed to take all of these factors into account and give the necessary warnings to the master or take other precautions against damage. It has violated a legal duty whether or not it also had a contractual one.

V.

 But, while the wharfinger failed to use all due care, the vessel was not blameless. Knowing that the facility was unfamiliar, the captain succumbed to the invitation to move in darkness. While three tugs might have been adequate, four would, he knew from his own experience, have been better; he chose to save cost. And while he did not enter on an angle of ten degrees as charged, he did approach at an angle that caused his bow to strike the dolphin.

In sum, I conclude that there was mutual fault, and that damages should therefore be divided. This is not a choice of the easy way out. Insofar as the wharfinger is concerned, this result places on him a responsibility not previously adjudicated. And the vessel owner may demur that the trier of facts dared, but did not dare enough. However, au fond, this decision is based on simpler concepts. At sea or on land, negligence is failure to use due care under all the circumstances. Wharfinger and master each failed in some regards. Each is then at fault.

The damages that may be proved are to be divided equally between the parties. While the recent Supreme Court decision in United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), requires an apportionment of damages according to the degree of fault of the parties, the fault here was equal. Accordingly, judgment is entered in favor of Bunge Corporation for one-half of the difference between the damages which Bunge may later prove and the damages which Furness, Withy & Co. may prove.