**DELTA TRANSLOAD, INC.,**
**Plaintiff-Appellee,**

v.

**The MOTOR VESSEL, "NAVIOS COMMANDER", Its Engines, Apparel, Tackle, Etc., In Rem, Defendant,**

**Navios Commander, Inc., et al.,**
**Defendants-Appellants.**

**No. 86–3296.**

United States Court of Appeals,
Fifth Circuit.

June 8, 1987.

Ashton R. O'Dwyer, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Fri-

lot, Terry A. McCall, New Orleans, La., for defendants-appellants.

W.J. Larzelere, Jr., Lugenbuhl, Larzelere & Ellefson, New Orleans, La., for plaintiff-appellee.

Before WISDOM, JOHNSON, and GARWOOD, Circuit Judges.

WISDOM, Circuit Judge:

## I.

Delta Transload, Inc. (Delta) brought suit against Navios Commander, Inc., Navios Corporations, and Navios Ship Management Services, Inc. (sometimes hereinafter collectively referred to as Navios) for the loss of its mooring buoy and buoy chain.[1] The defendants, respectively, are the owner, charterer, and husbanding agent of the M/V NAVIOS COMMANDER (COMMANDER) which allegedly fouled the Delta buoy with her starboard anchor. The district court entered judgment against Navios on the question of liability. Navios appeals the judgment, asserting that the district court was wrong on the facts and wrong on the law.

In an unreported opinion the district court adequately described, as follows, the mooring berth and the COMMANDER's anchoring procedure. Soon after midnight on December 23, 1982, the COMMANDER moored at the berth of the Archer-Daniels-Midland Company (ADM) on the Mississippi River at Mile 121.3 near Destrehan, Louisiana. ADM hired Delta to load ADM products at the ADM berth. On this occasion, the COMMANDER was to be loaded by the DELTA TRANSLOAD NO. 1 (TRANSLOADER), a bulk commodity midstream transfer vessel owned by Delta and moored near the berth.

The ADM berth, located on the east bank of the Mississippi River, is 1,500 feet long with three upriver and two downriver ship mooring buoys. The upriver mooring buoys, each measuring eight by ten feet, line up perpendicular to the shore, 150 feet apart. In the berth, the ship must position her bow upriver in line with the center buoy and hold her position with anchors and mooring lines. In this case, the mooring lines were attached to the ship by T. Smith and Son, Inc. (Smith) line handlers who work in small aluminum boats among the buoys.

As a transfer vessel, the TRANSLOADER waits near the shore until the vessel to be loaded is berthed. Tugboats move the TRANSLOADER alongside the vessel. It is moored in place by attaching its lines to two floating buoys, one upriver and one downriver, each measuring six by eight feet. The upriver Delta buoy is in the line of the ship buoys, between the middle and shore-most ship buoys. A chain connects the buoy to a concrete piling embedded in the river bottom.

ADM warranted the ownership of the Corps of Engineers permit for the berth in the name of Tulane Fleeting, Inc. (an ADM subsidiary and operator of the berth), and agreed to "execute all documents as may be required to authorize the operation of the rigs by Delta under the terms of the permits". The permit for the Delta buoy shows the buoy located on the shore side of the shore-most ship buoy, not between the first and second buoys where it was actually located.

On the evening of December 22, 1982, the river was high and the current fast. The TRANSLOADER finished loading the FAIRWIND VENTURE and, still attached to its buoys, moved back towards the shore to wait for the COMMANDER. The derrick barge W–701 was a short distance upriver of the buoys, apparently there for structural modifications to be made to the Delta buoy. It is disputed whether the W–701 was also attached to the Delta buoy when the COMMANDER berthed.[2] An il-

---

1. The *in rem* suit against the M/V NAVIOS COMMANDER was dismissed for lack of jurisdiction.

2. If the W–701 was attached, the record below indicates that the Delta buoy would have been submerged. *E.g.,* Record at 194–95, 201–202, 204–205.

lustration of the layout of the vessels and the buoys is reproduced in the Appendix to this opinion.

The COMMANDER's pilot, Otis Robichaux, had maneuvered vessels of similar size into this berth previously and was familiar with its mooring system. The COMMANDER is a vessel of 115,000 gross tons and measures approximately 900 feet. The COMMANDER had one port and two starboard tugs assisting. Due to its large size, Robichaux could not see the river surface in front of the ship for a distance of one-quarter of a mile. Because of this "blind-spot" Robichaux maintained constant radio communication with the Smith line handlers on whom he relied to report the position of the vessel with regard to the ship buoys. He also kept constant radio contact with the COMMANDER's bow crew who relayed their observations and dropped the anchors on the pilot's order.

Only two witnesses testified regarding the anchoring process, Robichaux and Keith Tamplain, Delta's supervisor who was aboard the W–701 at that time. Robichaux testified that when the COMMANDER was between one hundred to two hundred feet upriver of the buoy line and entirely on the channel side of the buoys, according to the line handlers, he gave the order to the ship's crew to drop the port anchor. As the ship fell back, the line handlers and bow mate told the pilot the port anchor had fouled the channel-most ship buoy. After the entanglement was cleared and the port anchor relocated, Robichaux positioned the ship to drop the starboard anchor "coming in at a more controlled rate of speed". He ordered the starboard anchor dropped when the line handlers told him the ship was halfway between the center and shore-most buoys, about fifteen to thirty feet below the buoy line, while the ship was "dead in the water".

Robichaux testified the ship never went into the buoy line but he could not see the buoys and relied on the Smith line handlers for his position. Tamplain, the Delta supervisor, testified that although the anchors were dropped in the usual place, the ship travelled thirty feet past the buoy line after dropping the starboard anchor. Tamplain, however, was near the W–701 directly upriver from the COMMANDER and in his prior written statement he stated that he did not see the buoys because the W–701 blocked his view.

As the vessel dropped back on its anchors, Tamplain saw the TRANSLOADER's bow mooring cable tighten and bounce, and the bow of the TRANSLOADER move towards the COMMANDER. He ordered slack in the cable, then radioed the ship's tugs and determined that they had not fouled the Delta buoy. Tamplain communicated to Robichaux that the Delta buoy had been fouled. Tamplain suspected the ship had fouled the buoy by surmising that only something large could cause the TRANSLOADER's movements despite the tugs holding it in position. Robichaux did not believe the anchor fouled the buoy but this could not be confirmed until the anchor was raised, which Robichaux refused to do until daylight. Robichaux left the vessel about 2:00 a.m.

The ship's master reported the alleged fouling of the Delta buoy to the ship's agent, George Duffy, who met with the owner's attorney and Hector Pazos at the ship at daybreak. When Delta's general operations manager, George Poprick, relieved Tamplain at 6:00 a.m., he spoke to Duffy who was already onboard the COMMANDER. The parties decided to move the TRANSLOADER clear of the COMMANDER so the anchor could be raised to determine whether it had fouled Delta's buoy. To move the TRANSLOADER the bow mooring cable connected to the buoy had to be severed.

Before Poprick cut the cable he moved the TRANSLOADER toward the ship reeling in as much cable as possible. When the TRANSLOADER was about eight feet from the anchor chain Poprick observed the cable heading in the direction of the anchor chain, not towards the Delta buoy and he pointed this out to Duffy and others standing on the ship. Duffy recalled Poprick pointing out the cable. Ronald Drez, a Delta supervisor, observed the activities

from a boat near the TRANSLOADER, and testified that when the TRANSLOADER was about halfway between the shore and the ship he could see the cable heading in the direction of the anchor chain, not the buoy.

After cutting the cable, Duffy asked Poprick if he saw the buoy surface. Duffy testified Poprick answered that they had not seen the buoy for several days and did not know where it was. Poprick testified that he had seen the buoy periodically "come up with a wave" and could not recall telling Duffy they had not seen the buoy for a number of days. Drez testified Duffy told him they would not have cut the cable if they had known Delta had not seen the buoy for several days. That afternoon the COMMANDER attempted to raise its starboard anchor but the anchor winch did not operate. When the COMMANDER raised its anchor the next day, the anchor was "clean"; neither the chain nor the buoy were entangled in the anchor.

## II.

▮ The district court did not make a definite finding as to whether the COMMANDER had crossed the buoy line. Nevertheless, the court found that the COMMANDER had fouled the Delta buoy, accepting as credible Tamplain's observation of the TRANSLOADER's cable tightening and jerking, and the TRANSLOADER being pulled towards the COMMANDER after she dropped the starboard anchor. "As Tamplain surmised only a very strong force could pull the TRANSLOADER into the channel."[3] The district court accepted the testimony of Poprick and Drez that the TRANSLOADER's cable headed in the direction of the anchor chain, not the Delta buoy, and noted that Duffy who also observed the cable did not comment on this testimony. The court's finding that the COMMANDER had fouled the Delta buoy is not clearly erroneous.

The district court rejected Navios' argument that the events described by Delta's witnesses were caused by the W–701 which was allegedly attached to the Delta buoy when the COMMANDER dropped anchor. Navios' expert witness, Hector Pazos, suggested that the attempt of the W–701 to detach itself from the buoy when Tamplain asked it to move caused the bouncing of the cable observed by Tamplain, but this does not explain what pulled the TRANSLOADER out into the river or why the cable headed towards the COMMANDER's anchor chain. "It strains the imagination to suppose that the W–701 disengaged itself from Delta's buoy and then the buoy sank or snagged on something else near the COMMANDER's anchor chain."[4] The district court concluded the W–701 played no part in the loss of Delta's buoy and chain, and the only reasonable explanation was as Delta claimed, that the COMMANDER's anchor fouled the buoy or chain. We accept this finding as not clearly erroneous.

The district court rejected also Navios' argument that the dislocation of Delta's buoy caused the accident. The Corps of Engineers' permit allowed the buoy to be located between the shore-most ship buoy and the river's bank. Delta's buoy was, in fact, located between the center and shore-most ship buoys, a location where it was more likely to be fouled.

▮ "[A]lthough there is evidence to support [the district judge's finding on causation] the reviewing court on the entire evidence is left with the conviction that a mistake has been committed."[5] Clearly the position of the Delta buoy was a causative factor of the COMMANDER's anchor coming into contact with it. Had it been placed outside the line of the ship mooring buoys, the snagging would not have occurred. The district court found that the dislocation of the buoy was not a causal factor because the pilot, Robicheaux, knew its actual location. We do not concur in this conclusion for two reasons.

---

3. Opinion, No. 83–6154 at 8 (E.D.La. Apr. 3, 1986).

4. *Id.*

5. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985); Fed.R.Civ.P. 52(b).

First, the record, as developed so far, is insufficient to support a finding of the pilot's knowledge. The district court relied on the rule that a compulsory pilot, as a matter of law, is charged with constructive knowledge of a local condition.[6] We are not persuaded, however, that this principle applies to a hidden defect, a sunken object in an unforseeable location. The district court relied also on Robicheaux's testimony that he had previous experience in mooring at this berth and was familiar with the buoy layout. This fact does not lead to the conclusion that Robicheaux had actual knowledge of the location of the Delta buoy. He specifically testified he did not know the buoy was located among the ship mooring buoys, and had he known, he would not have given the order to deploy the starboard anchor as he did. Moreover, because the buoy normally rested below the river's surface and because Robicheaux had not encountered prior anchoring problems at this berth, it is reasonable to infer that he did not know the exact location of the Delta buoy even though he had anchored at the berth before.

Second, even if Robicheaux did have actual knowledge of the buoy's location, its dislocation is still a cause of the accident. By placing the buoy in a location where it was in violation of the permit and where it was more likely to be fouled, whoever is responsible for its placement may be at fault for causing the accident. Even if Robicheaux was guilty of negligence, his negligence does not relieve others who were contributorily negligent.

The district court's finding on causation was clearly erroneous. A remand is in order for a determination of whether the discrepancy between the buoy's actual and permitted location constituted a statutory violation, who bears responsibility for the dislocation, Delta or ADM, and what degree of fault is attributable to the dislocation.

### III.

When a moving vessel strikes a stationary object, such as a navigational aid, a presumption generally arises that the vessel is at fault.[7] The presumption operates against all parties who participated in the management of the vessel during the anchoring process.[8] In this case, the pilot, master, bow crew, and the Smith line handlers participated in the management of the vessel and would be ordinarily subject to the presumption.

The party against whom the presumption operates bears the burden of disproving it, not merely coming forward with countervailing evidence.[9] The district court therefore held Navios responsible for proving that the pilot, master, and bow crew properly performed their duties. The district court opinion is not clear as to whether Navios was also supposed to disprove the presumed negligence of the Smith line handlers. In any event, Navios was held liable for failing to prove lack of fault.

The presumption presupposes that had the vessel not been mismanaged, the accident would not have occurred. The presumption of negligence is usually well justified:

> Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way. It is not sufficient for the respondent to produce witnesses who testify that as soon as the danger became apparent everything possible was done to avoid an accident. The question remains, How then did the collision occur? The answer must be either that, in spite of the testi-

6. *See Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 798, n. 6 (5th Cir.1977).

7. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1894); *Inter-Cities Navigation Corp. v. United States,* 608 F.2d 1079 (5th Cir.1979); *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790 (5th Cir.1977).

8. *Woods v. United States,* 681 F.2d 988 (5th Cir.1982); *Merrill Trust Co. v. Bradford,* 507

F.2d 467 (1st Cir.1974); *Patterson Terminals, Inc. v. S/S Johannes Frans,* 209 F.Supp. 705 (E.D.Pa.1962); *Patterson Oil Terminals, Inc. v. The Port Covington,* 109 F.Supp. 953 (E.D.Pa. 1952).

9. *James v. River Parishes Co.,* 686 F.2d 1129 (5th Cir.1982); *Bunge Corp.,* 558 F.2d 790.

mony of the witnesses, what was done was too little or too late, or if not, then the vessel was at fault for being in a position in which an unavoidable collision would occur.[10]

Navios argues the finding of liability is erroneous since the district court was unable to conclude that any party was negligent. This theory appears logical; however, the inability to assign fault does not equate with a finding of non-negligence. Navios did not establish non-negligence, so the presumption remained, and the district court rendered judgment against Navios.[11] Nevertheless, because the district court's findings of fact appear to be incomplete and resulted in an ambiguous application of the presumption against Navios, we remand on this issue.

First, the presumption of negligence has previously been invoked only against moving vessels which damaged wharves, moored vessels, and other stationary, visible objects.[12] We do not think that the presumption should apply to allisions with sunken and hidden objects.[13] The trial record reflects a significant probability that the Delta buoy was submerged and not visible when the COMMANDER anchored. The parties presented conflicting testimony as to whether the buoy had or had not been sighted by Delta's employees for several days prior to the COMMANDER's arrival. The district judge, however, does not make a finding of fact as to whether the Delta buoy was visible or not. A possible inference may be drawn that the buoy was not visible; the line handlers would have seen it, had it been visible.

In other portions of the opinion, the district court charged both the pilot and the line handlers with knowledge of the buoy's existence and location, because of their prior experience in maneuvering vessels at this berthing facility. In these circumstances, such knowledge of an otherwise nonvisible object warrants imposition of presumed negligence against those operating the vessel who possessed this knowledge. If the buoy's presence was known, the accident was neither fortuitous nor unavoidable; therefore, the rationale supporting the presumption would not be violated. As we have discussed, however, the district court's findings as to knowledge are insufficient, and must be reexamined on remand.

Neither the master nor the bow crew were also found to have knowledge of the presence or location of the Delta buoy. At most, the master was aware that Delta employed a buoy system at this berth, but he had not been told of the buoy's location. To apply the presumption of negligence to the master and bow crew of the COMMANDER, the district court must find either that the buoy was visible or that these individuals otherwise possessed knowledge of its location. Because it is invoking the presumption, it is Delta's burden to prove either visibility or knowledge.

If Delta satisfactorily proves Robichaux's knowledge, then, of course, the presumption applies against him. Because Robichaux was a compulsory pilot,[14] however, Navios cannot be held responsible for his actions if he is solely to blame for snagging the Delta buoy.[15] Thus, if the district court should find the buoy was not visible or the master and bow crew were not sufficiently aware of the buoy, and Delta fails to prove, without benefit of any presumption, that the master and bow crew

---

10. *Bunge Corp.,* 558 F.2d at 795 (quoting *Patterson Oil Terminals,* 109 F.Supp. at 954).

11. *See James,* 686 F.2d at 1133; *cf. Woods,* 681 F.2d at 990 (affirming ALJ's determination that evidence presented was not sufficient to rebut the presumption of negligence).

12. *E.g., Woods,* 681 F.2d 988; *Inter-Cities,* 608 F.2d 1079; *Bunge Corp.,* 558 F.2d 790.

13. "The mere fact of collision between a moving vessel and a submarine pipeline furnishes no basis for any inference that the mishap was caused by the negligence of the vessel, of the pipeline, of both or without the fault of either." *Peoples Natural Gas Co. v. Ashland Oil, Inc.,* 604 F.Supp. 1517, 1525 (W.D.Pa.1985).

14. La.Rev.Stat.Ann. §§ 34:1041 *et seq.* (West 1985).

15. *Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique,* 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed.2d 1155 (1901).

were also negligent, only the presumed fault of the pilot remains as regards Navios' potential liability.[16] On the other hand, if Delta can prove that the master and the bow crew knew or should have known of the buoy's location, then the presumption applies to Navios as well.[17] In the latter case, the burden of proving the exclusive fault of the pilot falls upon Navios.[18]

The second problem with the district court's finding of liability against Navios involves the employment relationship between Navios and the Smith line handlers. Navios argued extensively below that the Smith line handlers were independent contractors. If so, then Navios is neither responsible for their presumed negligence by *respondeat superior* nor burdened with disproving their presumed negligence. The opinion below is unclear as to how this contention was resolved. The court referred to the Smith line handlers as parties involved in the anchoring process against whom the presumption operates, and charged them with knowledge of the buoy's location.

Furthermore, the district court held Navios liable because they failed to prove "the fault, or lack thereof, of *any* party involved in the anchoring" (emphasis added). Thus the judgment could be interpreted as deciding that Navios was liable for the presumed negligence of the Smith line handlers, who may not have been Navios employees. Apparently, the district court found that the Smith line handlers were independent contractors because the court noted that Smith was a party not joined in the lawsuit; if they were Navios employ-

ees, there was no need for Delta to name Smith as a defendant in the lawsuit.

■ Given these ambiguities in the opinion below, we remand this case to the district court. To discern correctly Navios' burden of proof, specific findings must be made regarding the visibility of the Delta buoy, knowledge of the buoy's location by the master and bow crew, and the employment status of the Smith line handlers.

### IV.

■ The district court noted as to the three Navios entities, "Defendants never argued a liability-based distinction so these entities are treated as one." All three, the owner, charterer, and husbanding agent, were held liable to Delta for the loss of its buoy and buoy chain. Navios asserts that only Navios-Owner had employees aboard the COMMANDER at the time of the allision. Consequently, they argue the presumption of fault, if it exists at all, can operate only against Navios-Owner.

The presumption of negligence was assigned to the pilot, master, bow crew, and Smith line handlers. Navios-Charterer, a time charterer, cannot be held responsible for the presumed negligence of any Navios-Owner employees aboard the vessel, or the Smith line handlers, even should the district court conclude that they were not independent contractors. Navios-Owner was the employer, and responsible for the acts of the compulsory pilot (unless he bears sole fault), the master and bow crew, and possibly the Smith line handlers. Navios-Agent hired the Smith line handlers on behalf of Navios-Owner who then may

---

**16.** Should the district court find that the presumption cannot be applied to the master and the bow crew, it is likely they cannot be found negligent with respect to their duties. In such a case, the master would not be aware that the pilot's order to drop anchor constituted negligence, nor could the bow crew fail to properly alert Robichaux of the buoy's position when they received his order to drop anchor.

**17.** Navios claims that the master and bow crew were not participating in the management of the vessel, and thus, cannot be presumed negligent, since the compulsory pilot has exclusive responsibility for safely anchoring the vessel. *Park S.S. Co. v. Cities Service Oil Co.*, 188 F.2d 804

(2d Cir.1951); *Union Shipping and Trading Co. v. United States*, 127 F.2d 771 (2d Cir.1942). We disagree; for although the pilot bears this duty, the master retains authority to countermand the pilot's orders which would place the vessel in a position of apparent and avoidable danger. *See The Oregon*, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; *Bunge Corp.*, 558 F.2d 790. Additionally, the master may be negligent by failing to ensure "a sufficient watch on deck, and that the men are attentive to their duties". *The Oregon*, 158 U.S. at 194–95, 15 S.Ct. at 808.

**18.** *The China v. Walsh*, 74 U.S. (7 Wall.) 53, 63–64, 19 L.Ed. 67 (1868).

have acquired liability through the doctrine of *respondeat superior.* Therefore, Navios-Agent cannot be held responsible for any party participating in the anchoring process.

As a result of the employment relationships outlined above, the Navios defendants never bore a burden to "argue a liability-based distinction" because the presumption of fault can attach only to Navios-Owner. On the record before us Navios Corporation (charterer) and Navios Ship Management Services, Inc. (agent) are not liable, regardless of any determination of liability against Navios Commander, Inc. (owner).

## V.

The issues of liability and damages for the loss of the Delta buoy and chain were bifurcated for trial. The action for damages is still pending. In ruling on liability, the district court made findings of fact as to who suggested and who possibly authorized cutting the TRANSLOADER cable.

Navios contends that Delta could have avoided its loss, in whole or in part, by not cutting the cable or by using precautionary measures to ensure subsequent retrieval of the buoy. This theory corresponds to their assertion of the doctrine of avoidable consequences, "which is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration".[19] The district court's findings on the above matters are superfluous to the holding that Navios negligently fouled Delta's buoy. Thus, any determination of disputed facts which could be raised by Navios in defense of the damages action is premature. When the damages action proceeds to trial, Navios is entitled to relitigate any matters relating to the cutting of the TRANSLOADER cable in asserting the doctrine of avoidable consequences. In the future action for damages, Navios may relitigate the findings of fact below which could support their assertion of the doctrine of avoidable consequences.

The case is REMANDED to the district court for further proceedings consistent with this opinion.

## APPENDIX

Channel

← Downriver          Upriver →

Navios Commander — Ship bouys — Transloader buoy — Delta Transloader — Starboard anchor chain

River's bank

GARWOOD, Circuit Judge, concurring: I join all of Judge Wisdom's excellent opinion. I append this writing simply to

**19.** *Southport Transit Co. v. Avondale Marine*     *Ways,* 234 F.2d 947, 952 (5th Cir.1956).

note that I remain convinced of the correctness of the view expressed in my dissenting opinion in *James v. River Parishes*, 686 F.2d 1129, 1133–34 (5th Cir.1982), while nevertheless recognizing that the majority opinion there is binding on us. I also observe that *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir.1977), like the other authorities relied on in this connection by the *James* majority, was tried before the July 1975 effective date of the Federal Rules of Evidence. *See Bunge Corp. v. M/V Furness Bridge*, 396 F.Supp. 852 (E.D.La.1975).