**SOUTH CENTRAL BELL TELEPHONE COMPANY, Plaintiff,**

v.

**MERRITT DREDGING COMPANY, Defendant.**

Civ. A. No. S85–1154(NG).

United States District Court,
S.D. Mississippi, S.D.

Feb. 27, 1989.

Robert C. Long, W. Joel Blass, Henry F. Laird, Jr., Gulfport, Miss., for plaintiff.

James O. Dukes, Gulfport, Miss., Cy Faneca, Biloxi, Miss., Ashton O'Dwyer, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, La., for defendant.

**1062**

## OPINION

GEX, District Judge.

This cause came on for trial before the Court without a jury beginning November 23, 1987, and continuing through November 25, 1987. The Court, after fully considering the testimonial and documentary evidence presented by both parties at trial, the arguments of counsel and the applicable law, and being otherwise duly advised in the premises, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

On March 16, 1984, plaintiff South Central Bell Telephone Company [SCB] was the owner of a submarine telephone cable spanning the East Pascagoula River at Pascagoula, Mississippi. It is this cable around which this entire suit revolves. The cable was a 1,525 pair, 24 gauge cable, approximately five inches in diameter. The pairs of wires contained in the cable were protected by an armored shield consisting of alternate layers of quarter-inch steel cable and quarter-inch lead sheathing. It was originally installed in 1969, pursuant to a United States Army Corps of Engineers permit dated March 11, 1969, authorizing installation of the cable pursuant to the terms thereof. The permit referred to an attached drawing which indicated that the cable was to be jetted 27 feet below mean gulf level at the lowest point in the river. The cable was shown entering the East Pascagoula River parallel to the East Pascagoula River Bridge 110 feet south of the center line of Highway 90, and 95 feet south of the center line of the highway on the west bank. The drawing also permitted the cable to be laid in a catenary or arc south of the draw to the bridge and fender works. No indication of the allowable distance south of the bridge was shown.

On March 16, 1984, the tug CAROL ANN was owned and operated by defendant, Merritt Dredging Company [Merritt]. The dredge NEW ORLEANS was owned by Kenner Marine & Machinery, Inc., but operated by and bareboat chartered to Merritt pursuant to the terms of a written charter party agreement.

At approximately 9:45 a.m. on March 16, 1984, the tug CAROL ANN was hipped to the after port quarter of the dredge NEW ORLEANS, pushing the dredge northbound in the East Pascagoula River. The dredge was being moved for storage above Highway 90. The tug CAROL ANN was small and possessed only a 320 horsepower engine. The tug MR. MAC was faced up to the stern of the dredge but upon leaving the dock was operated without motor power. On this date three crew members, employees of Merritt, were assigned to the dredge and its tows—Kenneth Pape, Wayne Pape and Donald Bergeron. Only Kenneth Pape was licensed to operate tugs and/or motor vessels and was the First Engineer operating the tug CAROL ANN on the date in question. The dredge NEW ORLEANS was approximately 192 feet in overall length, drawing approximately eight feet of water. The spuds on the dredge were approximately 75 feet long and 36 inches in diameter.

Approximately 2,000 feet south of the Highway 90 bridge, a railroad bridge spans the East Pascagoula River. As the flotilla proceeded up the river in a northerly direction, it passed through a railroad bridge toward its destination. As it approached the Highway 90 drawbridge, approximately one-quarter mile south of the bridge, the tug CAROL ANN radioed the bridge tender of the East Pascagoula River Bridge, Helen Guice, (working the 3:45 a.m. to 12:00 p.m. shift) to open the bridge. The bridge tender's log entry evidences that this call was received at approximately 11:05 a.m. Ms. Guice testified that when she first saw the tug, she noticed that one leg or spud was down farther than the other spud. According to her testimony, as she watched the flotilla proceed toward the bridge fender works, about 100 to 150 feet outside of the fender works in the center of the channel, the flotilla suddenly came to a halt and began shuddering. Ms. Guice testified that the flotilla appeared to have hit something. The tug stopped and at least three men ran forward and raised a spud

on the dredge. The process took approximately five minutes.

Shortly after the flotilla stopped, Ms. Guice received a second radio call from the tug CAROL ANN stating that they had run aground and that she should therefore close the bridge. When the men had lifted the spud, according to Ms. Guice, the flotilla floated free. She then received another call at approximately 11:21 a.m. asking her to reopen the drawbridge.[1] At this time, the flotilla proceeded up-river.

The testimony of Ms. Guice is corroborated by that of Glen Cates. At the time of the incident in question, Cates was employed as a tug captain for Colle Towing in Pascagoula, Mississippi. According to Cates, although he cannot remember the date, he clearly remembered the incident in question. Cates testified he was on duty on the date of March 16, 1984, and recalls the procession of the dredge and one tug proceeding up-river. He did not recall seeing the second tug. He was located on the east bank of the river and his attention was drawn to the procession or flotilla. He had never seen a dredge such as the NEW ORLEANS up that way and was interested in seeing it pass through the East Pascagoula River railroad bridge which was small and difficult to navigate.[2] He recalled that he noticed the dredge procession somewhere between 11:00 a.m. and 1:00 p.m. and watched as it proceeded through the railroad bridge.[3] As the flotilla got close to the traffic bridge, it came to a complete stop—just short of the bridge fender works. It appeared as if it had hit something, for the spuds of the dredge began to clatter. According to Cates, the dredge stopped 100 to 150 feet south of and west of (but still within) the fender works. At that time, two or three people on the dredge proceeded to work on the spuds. Cates was of the opinion that one of the spuds became stuck on something. The men on the dredge then adjusted the collar on the spuds dropping and then lifting both spuds. According to Cates, 20 to 30 minutes elapsed from the time the flotilla told the bridge tender to lower the bridge until it proceeded through the bridge.

Defendant attempted to discredit the testimony of plaintiff's witness through presentation of the testimony of two members of the crew of the flotilla—Kenneth Pape and Wayne Pape.[4] Kenneth Pape testified that on the date in question he was First Engineer operating the tug CAROL ANN, and in fact was the only member of the crew who possessed an operators license. According to Kenneth Pape, on March 16, 1984, they were moving the dredge NEW ORLEANS to a spot north of the Highway 90 bridge for storage. He was operating the tug CAROL ANN and Donald Bergeron was operating the tug MR. MAC—a 360 horsepower tug used only to aid the CAROL ANN due to its lack of a radio. As they were proceeding up-river passing through the East Pascagoula River railroad bridge, the flotilla bumped something in the fender works. He then told Donald Bergeron to stop the MR. MAC. At the time of this collision, the flotilla was 150 feet south of the fender works of the highway bridge making approximately two miles per hour. The current at the bridge was approximately one mile per hour. He

---

1. The times of the radio calls to the bridge tender are confirmed by the entries in the bridge tender's log and radio station log entries on the relevant date. (Plaintiff's Exhibits P–42, P–43). The entries also established that the tug CAROL ANN had, at approximately 9:45 a.m. on the same date, travelled through the bridge southbound.

2. Cates stated that it was a standing joke in Pascagoula that whoever hit the railroad bridge would—due to its condition—have to pay for it.

3. Plaintiff's Exhibit P–5 was identified by Cates as a photograph taken from the vantage point from which he viewed the procession looking toward the East Pascagoula River bridge.

4. The third member of the crew, Donald Bergeron, did not testify for the defendant although present at trial. Furthermore, although served with a subpoena by plaintiff, he was directed by counsel for defendant to leave the vicinity of the courthouse assertedly due to the failure of plaintiff to pay the required witness fee at time of service. Thus defendant's counsel effectively prevented the presentation to the Court of the testimony of Donald Bergeron.

then proceeded up-river toward the Highway 90 bridge and at 9:45 a.m. called the bridge tender to open that bridge. However, as he approached the highway bridge, he noticed the cable crossing signs on the river banks, became concerned over the dredge's spud depth and requested that Donald Bergeron lift the spuds. He then contacted the bridge tender to tell her to close the bridge. He let the flotilla drift back down-river as Bergeron dropped and then lifted the spuds a pin hole (or approximately five feet) higher. The tug CAROL ANN held the flotilla in place during this process. According to Kenneth Pape, the port spud remained lower than the starboard spud at all times while passing through both bridges, and when raised, neither spud projected much below the hull of the dredge. However, on cross examination, he admitted that shortly following the accident, he told a telephone company employee that the spuds were lowered to twelve feet below the bottom of the dredge. The flotilla remained at all times during the process within the center of the channel between the railroad bridge and the highway bridge. And, at no time did the flotilla move west of the westernmost highway bridge fender.

Kenneth Pape testified that it took only approximately ten minutes to raise the dredge spuds. He proceeded through the bridge at approximately 10:30 a.m., not 11:20 a.m. as evidenced by the bridge tender's log.[5] The flotilla did not bump or hit anything while travelling from the railroad bridge through the highway bridge.

Wayne Pape, brother of Kenneth Pape, also appeared at trial on behalf of the defendant. He testified that on March 16, 1984, there were only three crew members on the flotilla. His brother was operating the tug CAROL ANN, and he and Donald Bergeron, Deck Captain of the dredge, were on the dredge. According to Wayne Pape, the tug CAROL ANN was being used, he believed, because it was the stronger tug—had more horsepower. As the flotilla passed through the railroad bridge, the spud depth was approximately ten feet. While passing through this bridge, the barge hit something which sounded like concrete.[6] They continued through the railroad bridge toward the Highway 90 bridge. However, approximately 200 feet from the fender works of the highway bridge, he was informed by Donald Bergeron that Kenneth Pape wanted the spuds lifted to insure clearance of the cables crossing the river. When Kenneth Pape stopped pushing the flotilla with the tug CAROL ANN, the tug MR. MAC, which was tied to the dredge, hit the dredge causing it to chatter or shudder. He and Donald Bergeron then proceeded to raise the spuds. Although the starboard spud was raised as high as possible, the port spud continued to protrude through the bottom keeper by approximately one foot. The depth of the spuds when raised was seven to eight feet. Wayne Pape testified that at no time on that date were the spuds lowered. Furthermore, the process of raising the spuds took no more than ten minutes. Thus, despite the testimony to the contrary, the flotilla proceeded through the Highway 90 bridge at approximately 10:30 a.m.

The Court rejects the testimony of the Pape brothers offered by defendant as wholly lacking in credibility—being in direct conflict with the testimonial as well as the physical evidence presented at trial.[7] Initially, the testimony of these two defendant's witnesses directly conflicts with the testimony of Helen Guice and Glen Cates— two independent disinterested witnesses.

5. Kenneth Pape did testify, however, that the tug CAROL ANN had once previously passed through the Highway 90 bridge on the morning of March 16, 1984.

6. Wayne Pape admitted making a prior statement to a telephone company employee wherein he stated that the spuds hit something. At trial he denied the accuracy of the SCB employee and/or the accuracy of the statement.

7. Kenneth Pape appeared as corporate representative of Merritt. Thus, although Kenneth Pape was no longer an employee of Merritt, his appearance as corporate representative establishes a continuing interest in this litigation and/or bias in favor of Merritt.

Furthermore, the testimony of Kenneth and Wayne Pape conflicts in several important respects. Kenneth Pape testified that when the height of the spuds was increased, they were first dropped and then lifted. Wayne Pape on the other hand testified that at no time on the date at issue were the spuds dropped. Additionally, Kenneth Pape testified that Donald Bergeron had been operating the tug MR. MAC during the flotilla's procession to the railroad bridge and had remained aboard the MR. MAC throughout their passage through the railroad bridge in case the MR. MAC was needed to straighten the flotilla. Wayne Pape on the other hand testified that at the time of the collision with the unidentified object at the railroad bridge Bergeron was on the dredge. Furthermore, with regard to the testimony of Kenneth Pape, the Court finds it incredible that one could testify that the operator of the tug CAROL ANN knew he had ample water depth to safely navigate the river between the bridges due to his familiarity with the waterway and his observance of the passage of the deep draft supply vessels through the area, and yet had to stop the flotilla 150 to 200 hundred feet from the fender works of the Highway 90 bridge because, until he observed the cable crossing signs on the banks of the river, he was unaware of the presence of submerged cables in the area. It is evident that had he been sufficiently familiar with the waterway to have known the water depth therein, he would have been equally familiar with the existence of submerged cables under that waterway. Finally, the evidence establishes that both of these witnesses gave statements to the employees of SCB just shortly after discovery of the damage to the cable that conflict materially with the testimony given by them at trial.[8]

In light of the various discrepancies, conflicts and contradictions in the testimony of the defendant's interested witnesses, the Court concludes that the more credible testimony regarding the events of March 16, 1984, was that given by Helen Guice and Glen Cates.[9]

It is thus the finding of this Court that at approximately 11:05 a.m., after passing through the railroad bridge, Kenneth Pape radioed the bridge tender of the Highway 90 bridge requesting that the bridge be opened. Thereafter, while approaching the Highway 90 bridge, the flotilla—navigating with spuds below the surface—came to an immediate, shuddering stop. The tug CAROL ANN then again called the bridge tender, informing her that she could close the bridge because it had run aground. The crew members of the flotilla then lowered and raised the spuds of the dredge thereby freeing the flotilla. The entire process consumed from ten to twenty minutes and was conducted in the immediate vicinity of the plaintiff's cable.[10] During this process Kenneth Pape disengaged the power on the tug CAROL ANN and allowed the flotilla to drift down-river for a period of approximately ten minutes in a strong river current of one mile per hour or more. The tug CAROL ANN called the bridge tender at approximately 11:25 a.m. requesting that she reopen the bridge. The flotilla then proceeded through the bridge to the point of storage of the dredge.

Shortly after noon on March 16, 1984, SCB began receiving complaints that customers on the east bank of the East Pascagoula River were losing service. At approximately 11:45 a.m. on that date, notice of a compressor dehydrator alarm was also conveyed to SCB. In response to these complaints a repair technician, Otis Williams, was dispatched to Ingalls Shipyard on the west bank of the East Pasca-

---

**8.** Kenneth Pape stated to SCB employees that the spuds were lowered to 20 feet in the draw. Wayne Pape stated to SCB employees that the spuds, not the dredge, hit something.

**9.** The choice of the most credible version of a set of events is within the discretion of the trier of fact. *See generally Benton v. Kroger Co.,* 640 F.Supp. 1317, 1321 (S.D.Tex.1986).

**10.** The testimony of Glen Cates regarding the position of the flotilla at the time the spuds were lowered is corroborated by the signed statement of one of the crew members of the flotilla.

goula River. Upon determining the absence of any problem in the compressor dehydrator, Williams tested the cable running from the river to the shipyard and that running from the west bank to the east bank of the river. Testing revealed that service was being lost on that portion of the submerged cable running from the east to the west bank of the river at a location somewhere near the middle of the river. The problems with and/or damage to the cable caused continuous loss of service in the surrounding area, including that to Ingalls Shipyard, the Navy, and various other customers. Initially, SCB considered raising the 1,525 pair cable and attempting repairs. However, because this would require blockage of the navigational channel, such repairs were not possible. Accordingly, SCB decided to effect temporary restoration of service by splicing the damaged 1,525 pair cable into an abandoned 900 pair cable on the river bottom. These temporary measures were accomplished by employing all available qualified SCB personnel on a 24 hour basis for a period of five days or a total of 812 hours of technical time.

Thereafter, SCB, realizing that the damage rendered the 1,525 pair cable unusable and believing that the 900 pair cable was insufficient to handle the then present telephone traffic as well as anticipated long-term future expansion, acquired a new 1,525 pair cable. This cable was purchased from Western Electric. In approximately May of 1984 upon receipt of the cable SCB proceeded to lay it upon the river bottom and splice it back into the undamaged portions of the 1,525 pair cable located on the banks of both sides of the river.

SCB also hired Deviney Company, Inc., [Deviney] and Stroud Diving and Hydrography, Inc., [Stroud Diving] to effect repairs and raise and inspect the damaged cable to determine the exact location, nature, and extent of the damage to that cable. In April of 1984, Ken Quenones, lead diver employed by Stroud Diving, inspected and/or surveyed the submerged SCB cable to determine the location and nature of the damage. He found portions of the cable exposed and covered with debris. He was thus able to grab the cable and follow it along the river bottom. At one point in the river, the cable descended rapidly into a V-shaped depression approximately four to five feet in depth. The bottom of the V-shaped depression was approximately two feet in width. An accurate measurement of the depression was complicated by the presence of debris such as tree limbs. During the survey of the damage to the cable, Quenones kept field notes or a log which later became the property of Stroud Diving. These notes were used in the preparation of a report, including a drawing based upon the information provided by the diver, made available to SCB by Stroud Diving. On the date the area of damage was discovered, Quenones marked the area with a buoy. The following day, hydrographer Will Hux, President of Stroud Diving, used the buoy to make the necessary measurements. The field notes of the diver failed to note the depth of the submerged cable, noting only the depth of the river bottom.

The report completed by Stroud Diving establishes that the damaged portion of the cable was located at station 3+40 west of the westernmost highway bridge fender. The river bottom at this point was shown to be between 20 and 25 feet, with the damage depression area at 25 feet. The cable at this point was shown at a depth of 25 feet.[11] (*See* Exhibit P–48, pp. 1–3). The report notes a second measurement of the cable depth at stations 3+90 and 3+80. This measurement revealed the river bottom water depth at 17 to 18 feet and the cable depth at 17 to 18 feet. Quenones testified that tone testing revealed that the cable followed a fairly straight path across the river. It was distinguishable from other cables in the area by its diameter and the materials used in production of the jacket of the cable.

11. Defendant's counsel noted that the report placed the damage at 19 feet. Quenones explained that the 19–foot figure probably indicated the measurement, "below mean gulf water" level.

Quenones testified that although unaware of the requirements of the Corps of Engineers permit requirements for installation of this particular submerged cable, he was familiar with the requirement that a cable be "jetted". Cable is jetted, according to Quenones, through the use of a high pressure water pump, which installs the cable under the bottom of the river. He further testified that the Stroud report noted that the SCB cable was one-quarter to one-third exposed. According to Quenones, he would not expect a newly "jetted" cable to be exposed on the bottom of the river or for a jetted cable to collect debris such as that found at station 3 + 40—the damaged area of the cable. He did note, however, that even a "jetted" cable sometimes becomes exposed over a period of time.

Will Hux, an expert in the field of hydrography and permit compliance, testified that he was first called to the scene of the damaged cable in April of 1984. It was he who surveyed the area and calculated the measurements contained in the Stroud Diving report (Exhibit P–48). He testified that he was extremely familiar with Corps of Engineers permits and compliance therewith, having applied for a least 100 such permits since 1978. In the opinion of Hux, the cable at the depth drawn on the survey was in compliance with the requirements of, and drawing attached to, the 1969 Corps of Engineers permit governing the installation of the submerged cable at issue in this litigation. The mean ocean depth level of 27 feet noted on the permit diagram, according to Hux, referred only to the deepest point of the channel. The survey completed by Stroud reflects that at this point, the cable was located at 31—well below the footage depth required. Furthermore, the horizontal measurements of the cable position, *vis-a-vis* the center line of the Highway 90 bridge, was 69 feet—well within the 75 foot public utility variance for Corps permits. Hux finally testified that upon inspection of the damaged cable and the marine survey, it was his opinion that the damage to the cable was caused by a verti-

cal force which depressed the damaged portion of the cable while raising the remainder of the cable.

L. Findley, Chief of the Permit Section, Regional Branch, Corps of Engineers, was called as a witness by the defendant. He testified that if the cable in question were found to have been installed less than or more than 110 feet from the center line of the highway bridge or at a depth of less than 27 feet below mean gulf level, installation of the cable would not have been in compliance with the letter of the permit. Findley admitted both that he was unaware of allowable tolerances or variances regarding such permits and that he lacked any knowledge of engineering capabilities regarding the laying of cable in exact compliance with given measurements.[12] He further testified that the permit drawing in question, although noting 110 feet southeast of the draw span of the highway bridge at the center of the channel as the appropriate distance for the installation of the cable, fails to note any specific position for the cable southwest of the draw span. As shown on the diagram the cable runs at an angle toward, and closer to, the highway as it moves from east to west. (*See* Exhibit P–40). He further testified that with reference to the required depth of the cable, the drawing noted only a required depth at the center of the channel of 27 feet below mean sea level.

Robert Lawrence Stickney, an expert marine surveyor, testified on behalf of defendant that after examination of the cable, he was of the opinion that the damage thereto could not have been made by the 36 inch diameter, 15 ton spuds of the dredge NEW ORLEANS. According to Stickney, the damage to the cable consisted of two separate indentations on two separate sides of the cable 30 inches apart. In Stickney's opinion, the 180 degree separation of the indentations negates damage by a spud. Stickney later admitted, however, that he was unsure of the actual size or weight of the spuds used on the dredge NEW OR-

---

12. The Court further notes that a letter from the Corps, attached to the permit, requires notification to the Corps only in cases of "material change in location." This would appear to signify that the Corps is unconcerned with nonmaterial variations in the cable position.

LEANS on the date in question. He further admitted that he was unaware of the weight and/or tensile strength of the cable in question. In his opinion, a direct hit by a spud would have smashed the cable. Furthermore, had the spud come down along side of the cable, it would not have caused the indentation. During cross examination Stickney testified that a double armored cable, such as the subject cable, when damaged twists around and/or springs and unravels due to the tension of the armor.

Stickney testified that station 3+40, the site of the damage reflected in the Stroud Diving report, is 140 feet south of the center line of the highway bridge. The cable depth of 19 to 23 feet as reflected by that report was above 27 feet below mean gulf level. Thus, according to Stickney, this cable was not laid in compliance with the Corps of Engineers permit.

The Court carefully listened to the testimony of defendant's expert, Stickney, and finds that his opinion was clearly tainted by his obvious bias in favor of the defendant and/or defendant's counsel. Accordingly, this Court finds that the testimony and/or opinions of Stickney were overly slanted in the defendant's favor and lack credibility sufficient to overcome the evidence presented by the plaintiff regarding the cause of the damage to the cable in question in this litigation.[13] The Court finds that the credible evidence presented by the plaintiff establishes that the damage to the cable was caused by a vertical force which depressed the cable at station 3+40 causing a rupture of the cable jacket or armor of the cable. The puncture and/or damage to the cable caused the cable armor to twist or unravel thereby creating the appearance of two punctures 30 inches apart at a 180 degree angle noted by Stickney. The damage to the cable was clearly consistent with the vertical force of a spud striking said cable when dropped from the dredge NEW ORLEANS at the point of the river identified as station 3+40.

As stated previously, Phase I, the temporary repairs to the SCB cable, was effected shortly following the discovery of the damage. These repairs—consisting of the splicing of the 1,525 pair cable to the 900 pair cable—required 812 man hours of repair technician time.[14] Additionally, SCB records reflect that temporary repairs required 104 man-hours of engineering department time.[15]

In Phase II SCB effected both the installation of a new 1,525 pair cable and the splicing of this cable into the remaining undamaged portion of the 1,525 pair cable. This phase required 496 man-hours of repair technicians' time in May and June of 1984. Additionally, the telephone company was required to hire and contract with Deviney and Stroud Diving to aid in the excavation of the banks and placement of the new cable. They were hired to raise the damaged cable and inspect it to determine the extent and nature of the damage, as well as its precise location. Stroud Diving was also hired to survey and/or report on the damage to the cable. The entire cable was then raised. Upon inspection, it was deemed unusable, the damaged portion cut out, and the remainder of the cable was abandoned to the river bottom. The remaining useful life, if any, of the damaged cable was unknown.

The witnesses for SCB testified that the following costs and expenses were incurred

---

13. The determination of the credibility of even uncontradicted and/or disinterested testimony is within the province of the trier of fact. *See generally United States ex rel. Jones v. DeRobertis,* 766 F.2d 270, 273 (7th Cir.1985); *Woods v. U.S.,* 724 F.2d 1444, 1452 (9th Cir.1984); *NBO Industries Treadway Co., Inc. v. Brunswick Corp.,* 523 F.2d 262, 277 (3rd Cir.1975); *United States ex rel. Guste v. M/V TESTBANK,* 564 F.Supp. 729 (E.D.La.1983), *aff'd.* 767 F.2d 916 (5th Cir.1985).

14. Man-hours were calculated on the basis of employee daily reports of hours expended.

15. All figures regarding the hours consumed in repair of the cable were obtained from the uncontradicted testimony of Betty M. Dear, Supervisor of Cost Records for SCB, and exhibits to her testimony; the testimony of Danny Lee, Claims Investigator for SCB; and Wilson Holder, Manager of Installation and Maintenance for SCB.

in Phase I and II of the repair of the damaged cable:

Phase I

| Labor | $22,305.69 | |
|---|---|---|
| Overhead | 14,194.18 | |
| Vehicles | 2,493.81 | |
| Total | | $ 38,993.68 |

Phase II

| Labor | $11,619.24 | |
|---|---|---|
| Overhead | 8,189.56 | |
| Vehicles | 1,321.64 | |
| Total | | $ 21,130.44 |

Engineering

| Salaries | $ 3,906.55 | |
|---|---|---|
| Overhead | 1,051.36 | |
| Total | | $ 4,957.91 |

Contract Expense Materials

| Outside Labor | | |
|---|---|---|
| (Contractors) | $12,375.91 | |
| Material | 12,395.09 | |
| New 1525 pair | | |
| cable | 58,299.24 | |
| Total | | $ 83,070.24 |

TOTAL COSTS     $148,152.27

SCB's Supervisor of Cost Records and the exhibits admitted during her testimony at the trial of this matter verified the above charges.

The SCB representatives [16] testified that all SCB charges for labor were calculated on the basis of a "loaded labor rate." This term was defined as the Federal Communications Commission [FCC] allowable charge for labor when calculated to include overhead. The overhead included represents a percentage increase for the cost to SCB for supervision, social security, materials, and supplies. A similar load factor is added to all charges for materials and supplies as reflected by the prior breakdown of charges. The load factor, according to SCB witnesses, does not include profit to SCB. No differentiation is made in this system of labor cost calculation for regular versus overtime labor costs. Such in-

creased expense is contemplated in calculation of the load factor. Additionally, contract charges by Deviney, pursuant to its contract with SCB, include a ten percent assessment on all actual charges by third-party subcontractors, such as the towage charges of F & F Towing. Furthermore, Danny Lee admitted during cross examination that, although the original 1,525 pair cable was raised from the river bottom to determine its usability, the damaged portion of the cable was removed solely for purposes of the present litigation. Removal of this portion of the cable was not a necessary part of the repairs attributable to the damage to the cable.

Defendant contested the reasonableness of the charges claimed by SCB to be attributable to the damaged cable via the testimony of defendant's expert, Stickney. Initially, in the opinion of Stickney, the loading factor charged by SCB was not reasonable because it was charged twice, once on labor and once on materials. Thus, as Stickney testified, the material costs should, according to his method of calculation, be reduced by the load factor of ten percent, thereby reducing the material costs to $11,156 rather than the $12,395 claimed. Similarly, the cost assessed for new cable expense should be reduced by ten percent, decreasing that charge from $58,299 to $52,470.[17] Additionally, Stickney testified that no charge should be allowed for "engineering" because the costs attributable to SCB's in-house engineers are nothing more than an overhead item.

Stickney also testified that the hourly rate charged by SCB in calculating its repair costs was excessive. In his opinion, the reasonable average hourly labor rate should have been no more than $15.00 per hour—the highest rate of pay received by any of SCB's repair technicians as established by the testimony of Otis Williams. Using an hourly rate of $15.00 per hour to calculate the cost incurred in the 812 hours

16. Danny Lee, Claims Investigator for SCB and Betty M. Dear, Supervisor of Cost Records for SCB.

17. The Court notes here that no explanation was given for the necessity of this ten percent reduc-

tion. The figures provided by SCB did not note a load factor added to cable cost nor did SCB's witnesses testify that the load factor was applied in determining that cost.

spent on Phase I reduces that figure to $12,180. Similarly, when multiplied by a $15.00 hourly rate, the cost of the 496 hours spent in effecting the repairs in Phase II is only $7,440. Thus, according to Stickney, the true cost for labor should reasonably be $19,620, not the $33,924.94 claimed by SCB. Stickney further testified that numerous items claimed by SCB in its calculations should be disallowed *in toto* because they constituted expenses which SCB would have incurred whether or not the cable had been damaged. These included all charges for vehicles, overhead and engineering. In sum, in Stickney's opinion, the charges and expenses representing the true reasonable costs of repair of the subject cable, were as follows:

| | |
|---|---|
| Phase I Labor | $12,180.00 |
| Phase II Labor | 7,440.00 |
| Outside Material | 11,156.00 |
| Outside Labor | 12,375.91 |
| New Cable | 52,470.00 |
| **TOTAL** | **$95,621.91** |

Finally, Stickney stated that in his opinion the useful life of the cable in question when installed new in 1969 was approximately 30 years. This cable was 15 years old on the date of damage. The new cable installed in 1984 also had a useful life of 30 years. It follows, according to Stickney, that since the repairs resulted in replacement of the submerged portion of the cable and thereby extended the useful life of the cable by 15 years, the total costs of repairs should be reduced by 50 percent.

In reviewing Stickney's testimony, the Court notes that the asserted reasonable hourly rate upon which defendant's expert relies flies in the face of the evidence presented at trial. This figure fails to reflect any charge for overtime hours worked by SCB employees in effecting the necessary repairs. When consideration is given to reasonable overtime rates—which Williams testified entitled him to payment of time and a half ($23.00) or double time ($30.00)—it is evident that the $27.47 per hour for Phase I and $23.43 per hour charged in Phase II for actual labor, prior to addition of the load factor, is a reasonable hourly rate for the repairs effected.

Stickney's attack upon SCB's charge for engineering services is equally baseless. Expenditures for engineering services would normally be a proper charge necessarily incurred in repairs such as those in the instant action. Defendant presented no proof to the contrary. The mere fact that in-house, as opposed to outside engineers, were used does not alter the propriety of these charges. *See Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300, 304 (5th Cir.1976) and cases cited therein.

Similarly, the Court finds no merit in Stickney's attack upon the load factor or overhead charges included within SCB's calculation of costs of repair. The evidence presented at trial establishes that the (approximate) ten percent loading factor represented materials, supplies and various overhead items. The evidence additionally establishes that the accounting system employed by SCB conforms to C.F.R. Sections 31.01–1, *et seq.*, the Uniform System of Accounts for Class A and Class B Telephone Companies approved by the FCC. Further, the Court finds that the load factor represents a reasonable charge for overhead allowable as a part of the costs of repair. *Boh Bros. Const. Co., Inc. v. M/V TAG–ALONG*, 569 F.2d 217, 218 (5th Cir. 1978); *Freeport Sulphur Co. v. The S/S HERMOSA*, 526 F.2d 300, 304 (5th Cir. 1976).

In only one area does the defendant's attack upon the damages claimed by the plaintiff possess sufficient merit to warrant a reduction in those damages. It is well settled that in determining damages properly available in an action such as the present, the cost of repairs of the damaged item must be reduced by the depreciation to the damaged structure and/or increase in useful life resulting from the repairs. *Pizani v. M/V COTTON BLOSSOM*, 737 F.2d 1334 (5th Cir.1984); *Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300 (5th Cir.1976). The undisputed evidence in this action establishes that the cable in question was installed in 1969—15 years before the incident in question. SCB's witnesses testified that the useful life of both the old and new 1,525 pair cables was unknown. Defendant's expert, Stickney, tes-

tified that the useful life of such a cable was approximately 30 years—conveniently exactly twice the age of the cable when damaged. As noted previously in this Opinion, the bias of the defendant's expert was obvious throughout his testimony. It is evident that this bias tainted his testimony regarding the useful life of the cable. In order to offset this evident bias, the Court interprets the term "approximate" employed by Stickney to denote the outer limits of 30. Accordingly, the Court finds the useful life of the cable in question to be 39 years. As previously noted, at the time of the collision, the cable was 15 years old. The remaining useful life of the cable was accordingly 24 years. It was therefore 15/39 or 38 percent depreciated. SCB's repair costs must be reduced by 38 percent, or $56,297.86.[18] The total damages recoverable for costs of repair by SCB are, accordingly, $91,854.41. *See Pizani v. M/V COTTON BLOSSOM*, 737 F.2d 1334 (5th Cir. 1984); *Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300 (5th Cir.1976).

### Conclusions of Law

### I.

This Court has jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. Section 1333, admiralty and maritime jurisdiction. Venue is properly laid in the Southern District of Mississippi.

### II.

■ The plaintiff, SCB, bore the burden of proving the defendant's liability. Specifically, plaintiff was required to prove by a preponderance of the evidence that an appurtenance of the dredge NEW ORLEANS caused the damage to SCB's submerged 1,525 pair cable. *Texas Eastern Transmission Corp. v. Garber Brothers, Inc.*, 494 F.Supp. 832 (E.D.La.1980); *Witco Chemical Corp. v. M/V MISS CAROLYN*, 426 F.Supp. 373 (W.D.La.1977). The Court finds that plaintiff has satisfied its burden in this cause, having established by a preponderance of the evidence that the tug CAROL ANN and the dredge NEW ORLEANS caused the damage to the cable forming the basis of the present action. The evidence presented at the trial of this cause established by a preponderance of the evidence that while approaching the Highway 90 drawbridge crossing the East Pascagoula River on March 16, 1984, the crew of the flotilla, consisting of the tugs CAROL ANN and MR. MAC and the dredge NEW ORLEANS, negligently operated the tug CAROL ANN and dredge NEW ORLEANS causing a spud of the dredge NEW ORLEANS to be dropped vertically upon the submarine cable of the plaintiff. The impact of the spud upon the cable punctured the armor of the cable, thereby causing permanent and irreparable damage thereto. The operation of both the tug CAROL ANN and the dredge NEW ORLEANS was clearly negligent and was a proximate cause of the damage to the cable in question.[19]

### III.

■ Defendant contends that under the Pennsylvania Rule, even if the defendant's liability has been established, in order to recover damages in this action, plaintiff as

---

**18.** The required reduction in damages remains the same whether calculated according to the depreciation formula employed by this Court or the "useful life extension" method. Here, since the damage to the cable rendered it useless, the Court finds that the "depreciation" method of calculation is the applicable formula. *See Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300, 304–06 (5th Cir.1976).

**19.** The Court in reaching this decision has not applied the presumption of negligence normally applicable where a moving vessel collides with a stationary object. The Fifth Circuit Court of Appeals has indicated that in cases of submerged objects the presumption is not applicable. However, knowledge of the location of the otherwise non-visable object may warrant imposition of the presumption. As stated previously, Kenneth Pape affirmatively testified to his knowledge of the area within which the collision in question occurred. The presumption of negligence could therefore possibly be applicable in this action, thereby establishing the defendant's liability herein. *See Delta Transload, Inc. v. M/V NAVIOS COMMANDER*, 818 F.2d 445, 450 (5th Cir.1987). The Court is of the opinion, however, that the evidence establishing defendant's negligence in this cause is sufficient to obviate the necessity for the application of the "presumption of negligence."

the owner of the submarine cable in question must prove both compliance with the Corps of Engineers permit governing installation of the cable and that the violation of a permit condition could not have contributed to the casualty. *Delta Transload, Inc. v. M/V NAVIOS COMMANDER,* 818 F.2d 445 (5th Cir.1987); *Pacific Gas and Electric Co. v. The Steamship LOMPOC,* 291 F.Supp. 767 (N.D.Cal.1968); *American Zinc Co. v. Foster,* 313 F.Supp. 671 (S.D. Miss.1970).[20] Here, defendant contends that both the depth of the cable and its distance south of the center line of the Highway 90 bridge contributed to and/or caused the damage to the cable, because absent the location of the cable, a spud when dropped would not have effected any damage.

■ The Court, after full consideration of the evidence presented at trial, finds that the plaintiff has satisfied its burden, having established by a preponderance of the evidence that the cable in question was originally installed and maintained in compliance with the applicable requirements of the Corps of Engineers permit. The Court further finds that no violation of that permit occurred after installation, nor could any such violation, if found to exist, have caused and/or contributed to the collision and resulting damage to the cable. The diagram attached to the permit, referred to therein, and attached to the original application, did not as defendant contends set forth the exact requirements for installation of the cable without allowance for variance. The drawing merely set forth a guide for the installation of the cable from which SCB was not to materially vary. The terms of the permit do not state that exact compliance with all specifications set forth in the drawing was required.[21] Furthermore, the evidence presented at trial established that exact compliance with all listed specifications was, and is, not feasible because it is impossible to install a cable in *exact* compliance with such specifications. Accordingly, the Court finds that the cable, having been laid without material variation from the specifications within the permit, was installed and maintained in compliance with that permit.

### IV.

■ Defendant next contends that even if no permit violation occurred, SCB is still responsible for the damage to its cable, which was maintained as an unreasonable obstruction to navigation. The Court presumes that the defendant's argument is predicated upon an alleged violation of permit caused, following installation, by improper maintenance. However, no express statement of the defendant's allegation has been made. The Court's previous conclusion that on the date of the incident in question the SCB cable conformed to the requirements of the permit negates any such finding in this cause. Furthermore, the sole violation of the permit alleged by defendant which could have occurred through lack of maintenance was the depth of the cable (an allegation which this Court has found is not supported in this cause).

Yet, even if this Court were to so find, under no construction of the facts herein could the depth of the cable have caused or contributed to the accident in question—the cable damage having been located at a depth of 28 feet below mean gulf level, one

---

**20.** Defendant appears to assert that upon proof of a violation and a showing that the alleged violation caused or contributed to the accident, the defendant is exonerated from liability. The defendant's construction of the Rule is erroneous. "The Rule concerns only the question whether the alleged statutory violation was one of the collision's causes. The Rule does not exonerate other parties whose negligence may also have been a cause." *Crown Zelerbach Corp. v. Willamette–Western Corp.,* 519 F.2d 1327, 1329 (9th Cir.1975). *See also Pizani v. M/V COTTON BLOSSOM,* 669 F.2d 1084, 1090 fn. 6 (5th Cir.1982).

**21.** The letter from the Corps of Engineers attached to the permit, in fact, speaks only in terms of the necessity for approval of material changes. The letter specifically instructs the holder of the permit that, "[i]f for any reason it becomes necessary to make a material change in location or plans for this work, revised plans should be submitted promptly." Furthermore, the applicable CFR's provide that such drawings need only be, "sufficient for public notice (detailed engineering plans and specifications are not required)." 33 CFR § 325.1(d).

foot lower than required by the permit. Therefore, the Pennsylvania Rule is not applicable in this action to either negate or mitigate the finding that defendant's negligence was the sole proximate cause of the cable damage in question. *Cf., Orange Beach Water, Sewer and Fire Protection Authority v. M/V ALVA*, 680 F.2d 1374, 1382–83 (11th Cir.1982); *Atlantic Pipe Line Co. v. Dredge PHILADELPHIA*, 247 F.Supp. 857, 862 (E.D.Pa.1965).

### V.

The proper measure of damages in this cause is the cost of repair. *See Boh Bros Const. Co., Inc. v. M/V TAG–ALONG*, 569 F.2d 217 (1978), *app. after remand*, 577 F.2d 303 (5th Cir.1978); *Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300 (5th Cir.1976). The evidence presented at trial, previously discussed by the Court in its findings of fact, establishes that the reasonable and necessary costs of materials, labor, et cetera, required to repair the cable and return it to its pre-collision condition were $148,152.27, broken down as follows:

| Phase I | |
| --- | --- |
| Labor | $22,305.69 |
| Overhead | 14,194.18 |
| Vehicles | 2,493.81 |
| TOTAL | $38,993.68 |

| Phase II | |
| --- | --- |
| Labor | $11,619.24 |
| Overhead | 8,189.56 |
| Vehicles | 1,321.64 |
| TOTAL | $21,130.44 |

| Engineering | |
| --- | --- |
| Salaries | $ 3,906.55 |
| Overhead | 1,051.36 |
| TOTAL | $ 4,957.61 |

| | |
| --- | --- |
| Outside Material | $12,395.09 |
| Outside Labor | 12,375.91 |
| New Cable | 58,299.24 |
| TOTAL | $83,070.24 |

The reasonableness of these charges is not affected by the fact that the repairs were accomplished through the use of in-house materials and labor. Costs of repair performed internally are recoverable. *Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300, 303–04 (5th Cir.1976). Similarly, SCB's charge for overhead included within its charges for labor and materials is both reasonable and properly awardable. *Boh Bros.*, 569 F.2d at 218; *Freeport Sulphur Co.*, 526 F.2d at 304.

### VI.

The total cost of repair of $148,152.27 must be reduced by the depreciation of the cable prior to its damage and/or the extension of the useful life thereof resulting from these repairs. *Pizani v. M/V COTTON BLOSSOM*, 737 F.2d 1334 (5th Cir.1984); *Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300 (5th Cir.1976). In the present action, the repair costs must be reduced by $15/39$ or 38 percent. The total awardable costs of repair, after deduction of 38 percent or $56,297.86 for depreciation, is $91,854.41. SCB is therefore entitled to judgment against defendant Merritt in the sum of $91,854.41, together with post judgment interest thereon at the legal rate from the date of Judgment until the date paid and all costs of this action.

A Judgment in conformity with the foregoing Opinion shall be submitted by counsel for SCB within ten days of the date of entry hereof.